914 F.2d 1224
 BAY AREA PEACE NAVY; Robert Heifetz; Thomas Caufield,
doing business as Bay Area Peace Navy, Plaintiffs-Appellees,
v.
UNITED STATES of America; U.S. Coast Guard; David
Zawadzki; U.S. Navy and James Webb, Defendants-Appellants.
 Nos. 88-2958, 88-15286.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 5, 1989.
Decided Sept. 14, 1990.
 
 Rick Richmond, Dept. of Justice, Washington, D.C., for defendants-appellants.
 James L. Kaller, Law Offices of James Lance Kaller, San Francisco, Cal., and Matthew A. Coles, Edward M. Chen, Margaret C. Crosby and Alan L. Schlosser, American Civ. Liberties Union Foundation of Northern California, San Francisco, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before TANG, CANBY and O'SCANNLAIN, Circuit Judges.
 CANBY, Circuit Judge:
 The United States appeals from the district court's decision (1) declaring a 75-yard security zone imposed by the Coast Guard during Fleet Week in 1986 a violation of the First Amendment rights of the Bay Area Peace Navy (the Peace Navy), and (2) permanently enjoining the Coast Guard "from imposing a security zone in excess of yards away from the reviewing stand on the pier or on the shoreline of San Francisco Bay during the opening ceremonies for any future Fleet Week." In addition, the government appeals the district court's award of attorneys' fees to the Peace Navy under the Equal Access to Justice Act (EAJA), 28 U.S.C. Sec. 2412.
 
 
 1
 Because the government has failed to meet its burden of demonstrating that the 75-yard security zone is a reasonable time, place and manner restriction, we hold that the zone is a violation of the First Amendment rights of persons desiring to demonstrate in boats off the Aquatic Park Pier during Fleet Week. However, we reverse the district court's award of attorneys' fees to the Peace Navy because we conclude that the government was substantially justified in taking the position it did, even though it did not ultimately prevail.
 
 BACKGROUND
 
 2
 Beginning in 1983, the Navy and the City of San Francisco have annually sponsored "Fleet Week," which includes a parade of Naval ships and a Blue Angels air show, in and over San Francisco Bay. Fleet Week is the largest annual Naval event in the United States and is intended to demonstrate that the Navy is well-prepared, effective and represents a sound investment of public funds. About 500,000 people watch the parade from the shore, while over 3,000 invited guests, including high-ranking military officers, local government officials and other dignitaries, watch from bleacher seats on Aquatic Park Pier. On the end of the pier there is a reviewing platform where approximately 60 of the highest ranking guests sit.
 
 
 3
 Every year since 1984, the Peace Navy, a non-profit association dedicated to using small boats for peaceful anti-war and anti-militarization demonstrations, has engaged in a counter-demonstration during Fleet Week by parading in formation in front of the invited guests on the pier during the parade of real Navy ships farther out in the Bay. The twenty-five to sixty pleasure craft in the Peace Navy, ranging in size from kayaks to thirty-foot vessels, display signs and banners expressing displeasure with military influence in the conduct of foreign policy and other messages. The Peace Navy has also employed other devices for conveying its messages. In 1986, a chorus of children sang anti-war songs from one of the boats in the counter-parade. And in 1987, the Peace Navy presented a water-borne theatrical production. In addition to the Peace Navy, hundreds of other groups or individuals protest or simply watch the Navy's Fleet Week parade from boats on the Bay.
 
 
 4
 During Fleet Week in 1983, 1984 and 1985, the Coast Guard imposed minimal restrictions on boaters during the Naval parade--safety zones around the pier during a parachute jump and a small boat demonstration, moving safety zones around each Navy ship, and a temporary safety zone in the area over which the Blue Angels fly. However, in 1986, despite the absence of any previous accidents or breaches of security, the Coast Guard imposed a 75-yard safety and security zone around the pier, effective from approximately 10:30 a.m. to 1:30 p.m. on the day of the Navy parade, which civilian boats were prohibited from entering. Because of the zone, the Peace Navy's message was not effectively conveyed in 1986 because the audience on the pier could neither read the banners nor hear the boatload of children singing. This 75-yard zone was re-established in 1987 on the ground that the zone was "needed to safeguard prominent public officials from subversive acts or accidents, or incidents of a similar nature."
 
 
 5
 The Peace Navy sought and the district court granted a temporary restraining order against enforcement of the 75-yard zone in 1987. The Peace Navy was permitted to come within 50 yards of the pier and to anchor a performance boat 25 yards from the pier for a close-up theatrical performance. In May of 1988, the district court permanently enjoined the Coast Guard from enforcing a zone greater than 25 yards during any future Fleet Week in the absence of changed circumstances demonstrating a tangible threat to security or dangerous weather conditions. After the entry of the permanent injunction, the Peace Navy requested and was granted $24,157.50 in attorneys' fees under the EAJA. The government appealed the district court's ruling both on the merits and on the attorneys' fees issue. We ordered the appeals consolidated.
 
 DISCUSSION
 
 6
 I. First Amendment Challenge.
 
 The Supreme Court recently reaffirmed that
 
 7
 in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."
 
 
 8
 Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community For Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068-69, 82 L.Ed.2d 221 (1984)). See also Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983)). Both parties agree that the portion of the San Francisco Bay off the Aquatic Park Pier is a "public forum" and that the Peace Navy's message constitutes "protected speech." In addition, the government argues, and the Peace Navy does not dispute, that the Coast Guard's regulation is "content neutral," in that it is " 'justified without reference to the content of the regulated speech.' " Ward, 109 S.Ct. at 2753 (quoting Community For Creative Non-Violence, 468 U.S. at 293, 104 S.Ct. at 3069); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)).
 
 
 9
 Therefore, the only issues contested on appeal are (1) whether the challenged regulation is "narrowly tailored" to serve a "significant governmental interest" and (2) whether the regulation leaves open ample alternative channels of communication.[1] The government bears the burden of proving that the "narrowly tailored" and "alternative communication" prongs are satisfied. City of Watseka v. Illinois Public Action Council, 796 F.2d 1547, 1551 (7th Cir.1986), aff'd without opinion, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987). Cf. Community For Creative Non-Violence, 468 U.S. at 293 n. 5, 104 S.Ct. at 3069 n. 5. ("[I]t is common to place the burden upon the Government to justify impingements on First Amendment interests").
 
 
 10
 The district court properly conceded that the government's interest in "protecting public and naval officials from attack" and in "marine safety" was "significant." The question then became whether the 75-yard security zone was a measure "narrowly tailored" to serve that interest. Determining whether a content-neutral time, place, or manner regulation is "narrowly tailored" to serve a significant government interest does not require that the regulation be the least-restrictive or least-intrusive means of serving the interest. Ward, 109 S.Ct. at 2757-58. See also Regan v. Time, Inc., 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (plurality opinion of White, J.). Rather, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, [ ] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 109 S.Ct. at 2758 (emphasis added). See United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906-07, 86 L.Ed.2d 536 (1985) (the validity of a regulation "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests").
 
 
 11
 Even though this standard gives the government leeway, we conclude that the district court was correct in holding that there was insufficient justification for the 75-yard free zone. The district court concluded:
 
 
 12
 Although the government's interest in protecting public and naval officials from attack is significant, there is no tangible evidence that a 75 yard security zone is necessary to protect officials during the "Fleet Week" ceremonies....
 
 
 13
 Although the government's interest in marine safety is significant, there is no tangible evidence that a 75 yard security zone is necessary to protect that interest. In prior years, the Coast Guard has demonstrated ample ability to operate safely without a 75 yard security zone.
 
 
 14
 These rulings clearly amount to a determination that the 75-yard zone "burdens substantially more speech than is necessary to further the government's legitimate interests." Ward, 109 S.Ct. at 2758. The record supports that determination. The only evidence offered by the government to support its claim that a 75-yard zone was essential to serve security interests was the existence of terrorism in the world generally and the opinions of various military personnel that a 75- or 100-yard zone was needed to protect against acts of terrorism. The references to terrorist or other threats of violent attacks were unrelated to incidents in the San Francisco Bay Area, or in the United States for that matter. In fact, Navy Commander George Farrar testified, in response to a question by the district court, that to his knowledge there had never been a "known threat" that would affect the audience on the Aquatic Park Pier. As the district court noted, there was no showing that Fleet Week presents "any danger that is not present each time a public official appears in public."
 
 
 15
 In addition, there was almost no testimony about marine safety concerns, except for a statement that a channel of access to the land by military vessels was useful for handling law enforcement and medical emergencies. There was no evidence presented that a 25-yard zone was insufficient for this purpose. At best, there was testimony that it is more difficult to maneuver in a 25-yard zone than in a larger zone, that maneuverability is affected by changing wind and weather conditions, and that the Fleet Week parade is an event normally crowded with many civilian boaters, implying that there is an increased likelihood of water-borne collision. There was evidence, of course, that safety had not been a problem in the years when there was no 75-yard security zone.
 
 
 16
 Although the government legitimately asserts that it need not show "an actual terrorist attack or serious accident" to meet its burden, it is not free to foreclose expressive activity in public areas on mere speculation about danger.[2] Cf. Boos v. Barry, 485 U.S. 312, 330, 108 S.Ct. 1157, 1168-69, 99 L.Ed.2d 333 (1988) (upholding a ban on congregations within 500 feet of a foreign embassy against overbreadth and vagueness challenges, noting that the statute does not reach peaceful congregations, only "groups posing a security threat"); Community For Creative Non-Violence, 468 U.S. at 311, 104 S.Ct. at 3078 (Marshall, J. dissenting) ("A mere apprehension of difficulties should not be enough to overcome the right to free expression"); United States v. Grace, 461 U.S. 171, 182, 103 S.Ct. 1702, 1709-10, 75 L.Ed.2d 736 (1983) (when there is no evidence of obstruction, threatened injury or interference with orderly administration, a ban on carrying a sign or banner on public sidewalks surrounding the Supreme Court building fails substantially to serve the stated purpose of "protect[ing] persons and property or [ ] maintain[ing] proper order and decorum within the Supreme Court grounds"). Otherwise, the government's restriction of first amendment expression in public areas would become essentially unreviewable.
 
 
 17
 In light of the whole record, and the district court's evaluation of the evidence, we conclude that the 75-yard security zone "burden[s] substantially more speech than is necessary to further the government's legitimate interests" and is therefore "substantially broader than necessary to achieve the government's interest" in protecting the audience on the pier from a speculative threat of violent attack or in promoting "marine safety" generally. See Ward, 109 S.Ct. at 2758; see also Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy") (citing City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-10, 104 S.Ct. 2118, 2131-32, 80 L.Ed.2d 772 (1984)). Should circumstances change, the permanent injunction entered by the district court provides for modification on the basis of evidence of, for example, a tangible threat to security or weather conditions inhibiting the government's ability to ensure marine safety.
 
 
 18
 We also agree with the district court that there are no ample alternative means of communication available to the Peace Navy. Of course, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). As the district court recognized, however, an alternative mode of communication may be constitutionally inadequate if the speaker's "ability to communicate effectively is threatened." Taxpayers For Vincent, 466 U.S. at 812, 104 S.Ct. at 2133. Restrictions have been upheld, for example, when "[the challenged ordinance] does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited," id. (emphasis added), and "the [challenged rule] has not been shown to deny access within the forum in question." Heffron, 452 U.S. at 655, 101 S.Ct. at 2567 (emphasis added).
 
 
 19
 The district court found both that the 75-yard security zone rendered the Peace Navy's water-borne demonstration "completely ineffective" and that "passing out pamphlets on land or demonstrating at the entrance to the pier are not viable alternatives because the invited visitors, who are the Peace Navy's intended audience, are not accessible from those positions." The Peace Navy cannot employ effective alternative water-borne methods of communicating with the audience on the pier with the equipment it now has and with the sound amplification restrictions that are not challenged here.[3] All other approaches to the pier are blocked. These facts are sufficient to support the district court's conclusion that "[t]he regulation imposing a 75-yard security zone does not leave open ample alternative channels of communication." An alternative is not ample if the speaker is not permitted to reach the "intended audience." See Students Against Apartheid Coalition v. O'Neil, 660 F.Supp. 333, 339-40 (W.D.Va.1987) (university regulation prohibiting erection of protest shanties on lawn of building where Board of Visitors meets is not rendered valid by permission to erect shanties elsewhere on campus, in place not visible to members of Board, the intended audience), aff'd, 838 F.2d 735 (4th Cir.1988). See also Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago, 419 F.Supp. 667, 674 (N.D.Ill.1976) (parade route through black neighborhood not constitutional alternative to route through white neighborhood when intended audience was white). Cf. Ward v. Rock Against Racism, 109 S.Ct. at 2760 (regulation may permissibly diminish audience if remaining avenues of communication are adequate); ACORN v. City of Phoenix, 798 F.2d 1260, 1271 (9th Cir.1986) (alternative channels exist where there are "myriad and diverse" methods of fundraising available and the organization can convey its message by distributing literature to automobile occupants, the intended audience).
 
 
 20
 Community for Creative Non-Violence and Heffron, relied on by the government, are distinguishable. In Heffron, requiring the International Society for Krishna Consciousness to deliver its message to state fair patrons from a booth did not prevent it from reaching its audience. Heffron, 452 U.S. at 654-55, 101 S.Ct. at 2567-68. And in Community for Creative Non-Violence, the Court found that the organization faced no barrier to presenting its message to the media and the public, the demonstration's intended audience. Community for Creative Non-Violence, 468 U.S. at 295, 104 S.Ct. at 3069-70. In contrast, the 75-yard security zone on the water side and the large crowd of the general public on the land side has clearly been shown to insulate the 3,000 or more Fleet Week official invitees on the pier from receiving the message of the Peace Navy and other demonstrators. The government has simply not met its burden of showing that there are sufficient alternative means of communicating the Peace Navy's message.
 
 
 21
 II. Attorneys' Fees.
 
 
 22
 The district court awarded fees of $24,157.50 under the EAJA, 28 U.S.C. Sec. 2412. The EAJA provides, in relevant part, that the district court
 
 
 23
 shall award to a prevailing party other than the United States fees and other expenses ... in any civil action (other than cases sounding in tort) ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or special circumstances make an award unjust.
 
 
 24
 28 U.S.C. Sec. 2412(d)(1)(A) (emphasis added). On appeal, the government argues only that its position was substantially justified and that therefore no fees should have been awarded.
 
 
 25
 We review the district court's determination of substantial justification for an abuse of discretion. Pierce v. Underwood, 487 U.S. 552, 560, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988); Kali v. Bowen, 854 F.2d 329, 334 (9th Cir.1988); Barry v. Bowen, 825 F.2d 1324, 1330 (9th Cir.1987). "There is an abuse of discretion when a judge's decision is based on an erroneous conclusion of law or when the record contains no evidence on which he rationally could have based that decision." Petition of Hill, 775 F.2d 1037, 1040 (9th Cir.1985). This is a "highly deferential standard," Kali, 854 F.2d at 334, and "[w]e may not substitute our view of what constitutes substantial justification for that of the district court; our review is limited to assuring that the district court's determination has a basis in reason." Pirus v. Bowen, 869 F.2d 536, 540 (9th Cir.1989). The government bears the burden of demonstrating substantial justification. Kali, 854 F.2d at 332; Barry, 825 F.2d at 1330.
 
 
 26
 On the other hand, "substantial justification" under the EAJA means that the government's position must have a "reasonable basis both in law and in fact," i.e., the government need not be " 'justified to a high degree,' but rather 'justified in substance or in the main'--that is, justified to a degree that could satisfy a reasonable person." Underwood, 108 S.Ct. at 2550. See Barry, 825 F.2d at 1330; Rawlings v. Heckler, 725 F.2d 1192, 1196 (9th Cir.1984). The government need not, therefore, "show that it had a substantial likelihood of prevailing." United States v. First Nat'l Bank of Circle, 732 F.2d 1444, 1447 (9th Cir.1984); Hill, 775 F.2d at 1042. In making a determination of substantial justification, the court must consider the reasonableness of both "the underlying government action at issue" and the position asserted by the government "in defending the validity of the action in court." Kali, 854 F.2d at 332. See United States v. Gavilan Joint Community College Dist., 849 F.2d 1246, 1248-49 (9th Cir.1988); Barry, 825 F.2d at 1330.
 
 
 27
 To meet its burden, the government argues that the Coast Guard was responding to what it considered legitimate safety and security concerns when it originally imposed the 75-yard security zone and that the government's decision to defend the Coast Guard's regulation was based on the plausible (albeit ultimately incorrect) legal theory that the regulation was merely a reasonable time, place and manner restriction which did not impermissibly infringe the Peace Navy's First Amendment rights. On the other hand, the Peace Navy contends that the government has not met its burden, pointing to the government's insistence on trial "despite repeated attempts by plaintiffs and hints from the judge that no distance over 25 yards was acceptable," the lack of concrete evidence regarding a concrete terrorist threat and general failure to consider plaintiffs' free speech rights.[4]
 
 
 28
 Although the issue is a close one in light of our deferential standard of review, we believe that the district court's decision that the government's position was not "justified in substance or in the main," Underwood, 108 S.Ct. at 2550, constitutes an abuse of discretion. The Coast Guard reasonably tried to establish a security perimeter, particularly in light of Congress' directive to "carry out ... measures, including ... the establishment of security and safety zones, ... to prevent or respond to acts of terrorism." 33 U.S.C. Sec. 1226(b)(1). It was also not unreasonable for the government to try to uphold the Coast Guard's regulation when confronted with litigation. In other words, "substantial justification" is shown in this case because the government has argued its position "forcefully and well," Kali, 854 F.2d at 334 (quotation omitted), Edwards v. McMahon, 834 F.2d 796, 803 (9th Cir.1987) (quotation omitted), "difficult questions" were raised and there is an absence of adverse precedent on point. Id. at 802-03. See Underwood, 108 S.Ct. at 2551-52 (the views of other courts on the merits of the issues presented can be relevant); Kali, 854 F.2d at 332 n. 2 (suggesting that the fact that the Ninth Circuit has not yet ruled on an issue may be relevant); Oregon Environmental Council v. Kunzman, 817 F.2d 484, 498 (9th Cir.1987) (absence of adverse precedent is relevant). The disagreement within this panel regarding the merits of the government's appeal further suggests that a finding of substantial justification is appropriate.
 
 
 29
 We AFFIRM the district court's decision enjoining the Coast Guard from imposing or enforcing a 75-yard security zone in the absence of new evidence of safety or security threats. The award of attorneys' fees to the Peace Navy is REVERSED. Each party will bear its own costs.
 
 
 30
 AFFIRMED in part; REVERSED in part.
 
 TANG, Circuit Judge, concurring:
 
 31
 I concur in Judge Canby's well-reasoned opinion. I write separately to take issue with the dissent's conclusions that (1) the 75 yard zone was narrowly tailored and (2) the interest in terrorism was so significant as to justify the regulation sought to be imposed here.
 
 
 32
 * The dissent errs in assuming that the regulation is narrowly tailored because the Coast Guard rejected a 100 yard limit proposed by the Navy. This assumption is flawed because it overlooks a key unspoken fact in that both the Navy and the Coast Guard may have a common interest in suppressing speech activities that may threaten the grandeur of Fleet Week.
 
 
 33
 This is an unusual time, place, manner restriction in that the Coast Guard which promulgated the regulation may simultaneously be likely to identify with the Navy's message. In the normal time, place, manner restriction case, the government is usually regulating how private speakers may use a public forum. However, such is not the case here. The Coast Guard is not an arbiter among private entities, rather it is deciding when and where private citizens may challenge government speech. As the dissent points out, Fleet Week is an opportunity for the Navy to show off the military power of the United States. Such a parade is certainly a type of political speech. See Dissent at 1233 (one of Fleet Week's purposes is "to demonstrate to certain invited visitors and to the public the view that the United States Navy is well-prepared and effective and represents a good investment of public funds."). Indeed, the Fleet Week parade may be said to parallel military parades such as those held in Red Square each May 1st.
 
 
 34
 Because the Fleet Week parade is government speech, courts must be particularly wary of how the government regulates those objecting to the government's speech. Rather than acting as an arbiter among private parties, the government in this situation undertakes the difficult role of decreeing how those who oppose the government's speech may lodge their objections. This difference makes the government regulation particularly susceptible to the possibility that an underlying improper purpose may be to use a time, manner, and place regulation as a means to reduce the effectiveness of the speech of the protesting groups.
 
 
 35
 An improper purpose may well exist here. The Navy arguably seeks to guard its largest annual events not only from terrorists, but also from those who disagree. Therefore, the Navy's 100 yard zone may be of questionable probative value in showing that the 75 yard zone is reasonable. Little comfort may be drawn from the fact that the Coast Guard rejected the Navy's 100 yard zone. The Coast Guard's motives may also be questioned. The Coast Guard and the Navy coordinate to police Fleet Week. The Coast Guard relies, for example, on fast Navy boats to provide part of Fleet Week's security. Moreover, the Coast Guard, as a water-borne law enforcement force trained along military lines, has far more in common with the Navy than with the protesting groups. Therefore, the dissent's assumption that the Coast Guard will arbitrate neutrally the Navy's interests and the First Amendment rights of the protesting groups is flawed.
 
 
 36
 Because neither the Navy nor the Coast Guard is a disinterested party, the dissent's willingness to accept the 75 yard zone without tangible evidence in support is troublesome. See Dissent at page 1235 ("[I]t is difficult to conceive of what 'tangible evidence' [of a security threat] the government could have introduced.") To allow, as the dissent would, the government to curtail the rights of those who oppose it without tangible evidence of a security threat undermines the First Amendment's goal to provide protest groups an opportunity to challenge the government. Thus, the dissent would permit the government to utilize the specter of an intangible and unquantified security threat to infringe upon First Amendment rights of those opposing the government's message.
 
 II
 
 37
 Second, the dissent's discussion of the terrorism threat is overblown. The dissent suggests that many horribles may occur if security interests are ignored. Security interests are significant. We live in a dangerous world. Terrorism is a serious risk. Yet the dissent's argument that even speculative security interests are so significant as to justify almost any type of regulation is pernicious to constitutional freedoms.
 
 
 38
 During World War II the government speculated about the security threat Japanese-Americans posed in order to justify their internment. Rather than reviewing carefully the government's speculations, a Supreme Court majority in Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) upheld the incarceration of Japanese Americans. In so doing, most now agree, the Korematsu court unwisely traded away the constitutional rights of many citizens for the sake of speculative national security concerns. Because of events like Korematsu, courts must be particularly wary of security measures based on speculative threats that erode constitutional freedoms.
 
 III
 
 39
 The United States Navy, like all our armed forces, exists to protect the American values embodied in the Constitution. Yet a 75 yard zone based on a speculative security threat, or on an unconscious desire to suppress protesting speech, undermines the very values of the Constitution that the Navy pledges to protect. The Constitution must be protected, not the authority of the Navy to demonstrate without interference its public relations message that it is a good investment of public funds. This case, like the Korematsu case, demonstrates the need to guard against a recurring theme in history: Vigilant measures allegedly taken in defense of American values may subvert the very values they seek to protect.
 
 
 40
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 41
 I concur in the majority's opinion to the extent that it holds that the government's position was substantially justified and that the district court therefore abused its discretion in awarding plaintiffs attorneys' fees. In my view, however, the government's position was more than "substantially justified"--it was correct. I therefore dissent from that part of the majority's opinion which affirms the district court's grant of a permanent injunction against the United States. I would find that the 75-yard safety-and-security zone was a valid time, place, or manner restriction on speech in a public forum.
 
 
 42
 * All three members of the panel agree as to the appropriate test for evaluating whether the three-hour safety-and-security zone violated the first amendment rights of the Peace Navy. It is the test for restrictions on the time, place, or manner of protected speech in a public forum.[1] As the majority notes, such restrictions may be imposed, provided that they " 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " Ante at 1226 (quoting Ward v. Rock Against Racism, 109 S.Ct. 2746, 2753 (1989) (quotation omitted)).
 
 
 43
 This is a three-part test, requiring (1) content neutrality, (2) narrow tailoring to serve a significant governmental interest, and (3) the preservation of ample alternative channels for communication. Because both sides seem to agree that the zone regulation meets the first prong of content neutrality, see ante at 1227, our job becomes easier: we need to examine only the second and third prongs of the test. Unlike the majority, I conclude, for the reasons detailed below, that the challenged regulation satisfies both of these remaining prongs.
 
 II
 
 44
 * To withstand constitutional scrutiny, any restriction here must "serve a significant governmental interest." Rock Against Racism, 109 S.Ct. at 2753 (quotation omitted). The government here has two significant interests. First, it has a significant interest in ensuring the security of public officials. Second, the government has a significant interest in ensuring maritime safety.[2] I examine each of these interests in turn.[3]
 
 
 45
 Fleet Week is the largest annual Navy event in the United States.[4] One of its purposes is to demonstrate to certain invited visitors and to the public the view that the United States Navy is well-prepared and effective and represents a good investment of public funds. Fleet Week is not, however, merely a Navy event. It is an event that the Navy has conducted at the invitation of the Mayor of San Francisco. Some 500,000 people pack the shore to watch the Navy parade in the San Francisco Bay, while anywhere from 3,000 to 6,000 invitees, including high-ranking military officers, local government officials, and other dignitaries, watch from bleacher seats erected at the end of the Aquatic Park Pier. The Pier, which curves out into the San Francisco Bay, is about 500 yards long, but only 10 to 12 yards wide. At the very end of the Pier is constructed a reviewing platform, on which sit 60 of the guests who are considered the highest ranking.
 
 
 46
 The government's undeniable interest in protecting the people on the Pier must be considered, as it was by the district court and apparently by the majority here, to be significant. Since Fleet Week is an event partially intended to demonstrate the United States' military strength and preparedness, it attracts many people in this country to whom these characteristics are distasteful. The government has a significant interest in protecting its officials from the possibility of certain actions against them by such people.[5]
 
 
 47
 As half a million people jostle for position on the shore and thousands on the Pier also watch, hundreds, maybe thousands (according to uncontroverted testimony) of boats sail about the Bay. Many of these find themselves between the end of the Pier and the area through which the Navy's ships parade; this United States Navy parade consists of ships with quite limited maneuverability. Further, the countless boats of the Peace Navy, Greenpeace, and other protesters, as well as those of mere spectators, also sail about. Most of these vessels are operated by recreational boaters, who are subject to no licensing or supervision here. And as anyone familiar with the San Francisco Bay knows, the wind, tide, and currents are often treacherous; they are especially so toward the end of the Pier.
 
 
 48
 Given all this, the government's other asserted interest--maritime safety--must also be considered to be significant here. The Coast Guard testified that, based on its considerable experience and pursuant to its statutory mandate,[6] it determined that a safety zone was necessary in these circumstances to ensure maritime safety and to protect against accidents. It further testified that such a zone is necessary to allow easy access to the Pier and the shore to handle potential casualties from accidents.[7]
 
 
 49
 Ensuring maritime safety and protecting citizens in these circumstances clearly constitute significant governmental interests.
 
 B
 
 50
 We must next ask whether the government's regulation is "narrowly tailored to serve" these significant interests. Rock Against Racism, 109 S.Ct. at 2753 (quotation omitted). For the reasons detailed below, I would find that the government has narrowly tailored its regulation.
 
 
 51
 It is important to describe what constitutes "narrow tailoring." As the majority points out, narrow tailoring does not require that the government adopt the least-restrictive means in promulgating its regulation. "Rather, '[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, [ ] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.' " Ante at 1227 (quoting Rock Against Racism, 109 S.Ct. at 2758) (emphasis and emendations added by majority); see also United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906-07, 86 L.Ed.2d 536 (1985) (the validity of a regulation "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests").[8] Courts should be "loath to second-guess the Government's judgment" as to whether a regulation " 'burden[s] substantially more speech than is necessary to further the government's legitimate interest.' " Board of Trustees of the State Univ. of New York v. Fox, --- U.S. ----, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989) (quoting Rock Against Racism, 109 S.Ct. at 2758).
 
 
 52
 The regulation contested in this action is the Coast Guard's imposition of a 75-yard zone around the end of the Aquatic Park Pier within which no civilian maritime vessels were permitted; this safety-and-security zone was in effect for only a three-hour period. The district court struck this down and permanently enjoined the Coast Guard from imposing a zone any larger than 25 yards.
 
 
 53
 I would conclude that the government has narrowly tailored its regulation to serve its significant interest in protecting officials. Originally, the Navy pressed for a 100-yard safety-and-security zone, believing it the minimum necessary, but the Coast Guard disagreed. Balancing "the rights of free people to freely express themselves" against the need for "minimal" protection, Reporter's Transcript ("R.T.") at 109, 97 (Feb. 23, 1988) (testimony of David Zawadzki, Captain of the Port and Commanding Officer of the Coast Guard Marine Safety Office in Alameda), the Coast Guard arrived at the 75-yard zone.
 
 
 54
 As noted, the district court concluded that "there is no tangible evidence" that a 75-yard zone is necessary to promote the concededly significant governmental interests. Yet it is difficult to conceive of what "tangible evidence" the government could have introduced. It is desirable that precautions be taken to avert problems, and here a narrow precaution was taken. The majority's seeming assertion that the government has shown only "mere speculation about danger," ante at 1228, is unfair. The government has shown that a safety-and-security zone served significant interests and that the zone's size (75 yards) resulted from narrow tailoring. As the government points out, the Coast Guard should not be forced to wait until a catastrophe occurs before it can demonstrate that the security concerns are real.[9]
 
 
 55
 All around us are "tangible" reminders of constant threats to individual security. The House of Representatives recently noted that "[m]any special events that provide the potential for terrorist actions directed against American citizens occur on or near our nation's coasts." H.R.Rep. No. 494, 99th Cong., 2d Sess. 48 (1985) (emphasis added), reprinted in 1986 U.S.Code Cong. & Admin.News 1865, 1914. Because of this potential, Congress specifically charged the Coast Guard with ensuring safety and security in the nation's ports through the "establishment of security and safety zones, and the development of contingency plans and procedures, to prevent or respond to acts of terrorism." 33 U.S.C. Sec. 1226(b)(1) (1988) (emphasis added). In response to that congressional directive, "each Captain of the Port around the country was tasked by Coast Guard Headquarters with doing vulnerability assessments.... to take a little broader look at safety and security issues." R.T. at 74 (Feb. 23, 1988) (testimony of Captain Zawadzki). As for the particular instance of Fleet Week and the crowd of dignitaries on the Aquatic Park Pier, the Coast Guard explained that "where you are out on a promontory, away from land, with a very narrow access or egress road, you're sitting out there and you have few options if something goes wrong or if someone poses a physical threat to those people out there.... The people out there would be vulnerable." Id. at 95 (testimony of Captain Zawadzki).
 
 
 56
 According to both the district court and the majority, "there was no showing that Fleet Week presents 'any danger that is not present each time a public official appears in public.' " Ante at 1228 (quoting district court). Not so, I think--the dangers are magnified tremendously by the fact that all the public officials at this event are crowded onto a small pier, with no easy means of egress. They could be sitting ducks, as it were, for terrorists who could quickly sail in from only 75-feet away (the size of the maximum permissible safety-and-security zone under the permanent injunction). That the government also closes the Pier itself to the public for twenty-four hours before parade day for security purposes should be seen as a further indication of its genuine concern with security.[10]
 
 
 57
 The tailoring was also narrow to promote the government's interest in maritime safety. Both Coast Guard and Navy officers testified that this above-described goal of ensuring maritime safety was promoted by the establishment of a safety zone. They further gave uncontradicted testimony of the utility of a safety zone of at least 75 yards. The majority, however, again takes a begrudging view of the evidence, stating that "[t]here was no evidence presented that a 25-yard zone was insufficient" for the purpose of providing "a channel of access to the land by military vessels ... for handling law enforcement and medical emergencies." Ante at 1228. Yet there was much other evidence: for instance, testimony about the unpredictability of winds and currents, the lack of maneuverability of Navy (that is, United States Navy) ships, the number of vessels in the Bay, and many other factors relevant to the appropriate size of a safety zone. Given also the Coast Guard's expertise in maritime safety, I am satisfied that the 75-yard zone met the "narrow tailoring" test.
 
 
 58
 In short, the Coast Guard properly acted in an anticipatory fashion to ensure security and to promote maritime safety. In so doing, it was advancing significant governmental interests through a narrowly-tailored regulation. The majority's implication that a catastrophe must first occur before a sufficient safety-and-security zone may be established is not compelled by the first amendment.[11]
 
 III
 
 59
 Because the government has satisfied the first contested prong of the test for time, place, or manner restrictions, the only remaining question is whether ample alternative channels for communication were left open. I think that such channels have been left open; in this, I disagree with the district court and the majority here.
 
 
 60
 First and most importantly, the Peace Navy is still free to sail. The fact that it would have to remain another 150 feet from the Pier--less than the distance from home plate to second base on a baseball diamond's basepaths--would not deprive it of its ability to mimic the United States Navy parade. The Peace Navy would still be in full view of the thousands of people on the Pier and the hundreds of thousands along the shore. Larger signs could still convey the Peace Navy's visual messages; indeed, permissible sound amplification--not proscribed by the safety-and-security zone because not affecting the above-described interests of the government--might make the Peace Navy heard, including a handful of children singing anti-war songs. The effective difference in communication between 25 yards and 75 yards would be minimal.[12]
 
 
 61
 Second, the use of handbills or pamphlets on land would enable protestors to reach the vast majority of those on shore. This traditional form of protest may be less inventive and clever than the use of boats only a few feet from shore, but that is not to say that it is therefore constitutionally inadequate.
 
 
 62
 Both the district court and the majority here base their findings of inadequacy on the idea that the alternatives would not allow the Peace Navy to deliver its message to the "3,000 or more Fleet Week official invitees on the pier." Ante at 1230. But as all its witnesses at trial testified, the Peace Navy is interested in reaching both the people on the Pier and the far-many more on the shore.
 
 
 63
 I do not gainsay that from 75 yards the Peace Navy would find it more difficult to present singing children and dramatic performances than would be the case from 25 yards. Nor do I argue that the Peace Navy's ability to present its message would not be affected in some ways by the requirement of a safety-and-security zone. Nevertheless, for the reasons set forth above, I am satisfied that the Peace Navy has ample alternative channels for communication of its message within the meaning of applicable constitutional principles.
 
 IV
 
 64
 The Coast Guard here promulgated its regulation in part to enforce Congress's mandate that it ensure security on our nation's coasts; it also acted pursuant to its statutory authority to ensure maritime safety. The regulation was effective for a brief three-hour period when 500,000 people packed the shore, several thousand more crowded onto the Aquatic Park Pier, and the waters around the Pier teemed with hundreds, if not thousands, of boats. Because I would find in these circumstances that the government's creation of a safety-and-security zone of 75 yards was narrowly tailored to serve the government's significant interests of ensuring individual security and maritime safety, and because I would find that the regulation left the Peace Navy with ample alternative channels to communicate its message, I would conclude that the zone was a valid time, place, or manner restriction on speech in a public forum. I would therefore reverse the district court's order of a permanent injunction.
 
 
 65
 For these reasons, I must respectfully dissent from that part of the majority's opinion which upholds the action of the district court.
 
 
 
 [1]
 "The question as to whether [the Peace Navy's] First Amendment free speech rights have been infringed is a mixed question of law and fact 'since it requires [the panel] to apply principles of First Amendment jurisprudence to the specific facts of this case.' [citation omitted]. The appropriate standard of review is de novo because the application of constitutional law to the facts of this case 'requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles.' " ACORN v. City of Phoenix, 798 F.2d 1260, 1263 (9th Cir.1986) (citations omitted)
 
 
 [2]
 The Peace Navy seems to argue that an analysis of the validity of the regulation can be undertaken with reference only to the safety and security threat posed by the Peace Navy. This is simply not true. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 652, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981) ("The justification for the [challenged rule] should not be measured by the disorder that would result from granting an exemption solely to [the challenging party]"). See also Community For Creative Non-Violence, 468 U.S. at 296-97, 104 S.Ct. at 3070-71; ACORN, 798 F.2d at 1270. Therefore, the testimony of Coast Guard Lieutenant Commander James Spitzer that the Peace Navy has been "cooperative" and has not represented a threat to the audience on the reviewing stand is not alone dispositive
 
 
 [3]
 In addition to accessibility to an audience or forum generally, an alternative has been held not "ample" or adequate because, among other things, it is "more expensive" than the prohibited means of communication. City of Watseka, 796 F.2d at 1558. Cf. Taxpayers For Vincent, 466 U.S. at 812 n. 30, 104 S.Ct. at 2133 n. 30 ("[T]he Court has shown special solicitude for forms of expression that are much less expensive than feasible alternatives"). The government's suggestion that the Peace Navy could purchase larger boats capable of handling larger banners may be constitutionally irrelevant for this reason alone
 
 
 [4]
 Failure to prevail does not raise a presumption of lack of substantial justification, Kali, 854 F.2d at 332, and the Peace Navy therefore correctly does not rely solely on its success below. Cf. Underwood, 108 S.Ct. at 2552 (the government could take a position which was substantially justified, yet lose)
 
 
 [1]
 The government and the Peace Navy agree that the portion of the San Francisco Bay off the Aquatic Park Pier is a "public forum" and that the Peace Navy's message constitutes "protected speech." See ante at 1227
 
 
 [2]
 The fact that there are two interests is why the zone is properly called a "safety-and-security" zone. It was indicated in the district court that, ordinarily, the Coast Guard will establish a safety zone to ensure maritime safety or a security zone to ensure personal security of individuals. Here, however, the 75-yard regulation served the purposes of both different kinds of zones
 
 
 [3]
 The district court found and the majority seems to agree that the interests set forth here are significant. I nonetheless undertake the inquiry myself because it is crucial to the next question examined--whether the government's regulation was narrowly tailored to serve these interests. That is one of the points on which I part company with the court below and the majority here. Moreover, the majority's discussion acknowledging the government's interests is rather begrudging
 
 
 [4]
 This summary of the facts is based on uncontroverted evidence submitted to the district court. All citations to the record in this case are to Bay Area Peace Navy v. United States, No. C 87-5133 AJZ (N.D.Cal.)
 
 
 [5]
 The majority properly rejects as "simply not true" the Peace Navy's argument "that an analysis of the validity of the regulation can be undertaken with reference only to the safety and security threat posed by the Peace Navy." Ante at 1228 n. 2. Even in past Fleet Weeks, all the protests have not been as peaceful or as non-dangerous as the Peace Navy says that its expeditions have been. For instance, in 1986, as the district court noted, " 'Five members of Greenpeace were arrested by the USCG [United States Coast Guard]. Two of those arrested were charged with assault on a federal office[r] when they rammed a USCG boat with their rubberized motor boat....' " Findings of Fact and Conclusions of Law at 5 (May 4, 1988) (quoting Naval Investigation Service Report) (my emendations and omission of footnote). It is important to emphasize that the Peace Navy's constitute only a very small percentage of the boats affected by the safety-and-security zone
 
 
 [6]
 Although ignored almost entirely by the district court and the majority here, the expertise and authority of the Coast Guard in maritime safety constitute no small point. Congress has on numerous occasions recognized that expertise by authorizing the Coast Guard to develop and implement regulations to promote safety in the nation's ports and waterways. It has done so because it has found that "navigation and vessel safety and protection of the marine environment are matters of major national importance." 33 U.S.C. Sec. 1221(a) (1988). In fact, Congress has given the Coast Guard numerous directives in order to promote the national goal of ensuring maritime safety. See generally 33 U.S.C.A. Secs. 1221-1236 (West 1986 & Supp.1990) (termed by Congress as the "Ports and Waterways Safety Act"); see, e.g., 33 U.S.C. Sec. 1233 (1988) ("The Commandant of the Coast Guard is authorized and empowered in his discretion to issue from time to time regulations, not contrary to law, to promote the safety of life on navigable waters during regattas or marine parades."). It was pursuant to these directives that the Coast Guard here promulgated the 75-yard safety zone struck down by the district court
 
 
 [7]
 For example, the Blue Angels air show is part of Fleet Week. Such a show undeniably poses a threat of catastrophic accident necessitating emergency rescue and first-aid assistance for many people. See, e.g., Scores Are Killed in Air Show Crash in West Germany, N.Y. Times, Aug. 29, 1988, at A1, col. 6 ("Three jets from a precision flying team of the Italian Air Force collided and crashed today during a low swoop past a crowd of 300,000 at a United States air base in West Germany, killing at least 46 people and injuring as many as 500 others.")
 
 
 [8]
 The district court here improperly applied a least-restrictive-means analysis. It correctly stated the test at the outset of its decision, but, in applying it, shifted to speaking in terms of necessity, not narrow tailoring. See, e.g., Findings of Facts and Conclusions of Law at 7 (May 4, 1988) ("there is no tangible evidence that a 75 yard security zone is necessary to protect officials"); id. ("there is no tangible evidence that a 75 yard security zone is necessary to protect [the government's maritime-safety] interest") (emphases added). The majority here recognizes yet glosses over this indisputable error
 
 
 [9]
 The Coast Guard's contention that a 75-yard security zone is narrow tailoring is buttressed by the fact that when it has faced the prospect of more-immediate security problems, it has enforced a far larger zone. For instance, when the Pope and Queen Elizabeth made visits to the Bay Area, the Coast Guard apparently enforced 1000-yard security zones. Cf. Navy, Unhindered, Successfully Launches a Trident 2, N.Y. Times, Dec. 14, 1989, at A28, col. 4 (stating that "[t]he submarine Tennessee successfully launched a Trident 2 missile yesterday without interference from protestors who had threatened disruption" and noting that the protestors were kept at a distance by a "safety zone, which extended 5000 yards from the launching") (emphasis added)
 
 
 [10]
 American soil is not somehow immune to security threats. See, e.g., Blast Wrecks Van of Skipper Who Downed Iran Jet, N.Y. Times, Mar. 11, 1989, Sec. 1, at 1, col. 1 (The "explosion that rocked the vehicle of Sharon Lee Rogers while she was on her way to work here [in San Diego] this morning may have been set off as an act of terrorism against the captain, Will C. Rogers 3d"); Caller Claims Pro-Iran Group Bombed Van, N.Y. Times, Mar. 16, 1989, at A17, col. 1; Defendant Gets 30 Years in Jail in Bombing Plot, N.Y. Times, Feb. 7, 1989, at B2, col. 1 ("A Japanese national described by Federal authorities as one of the first international terrorists caught and convicted in the United States was sentenced" by a federal district judge who called the man "a member of the Japanese Red Army.... [who] had built and transported [ ] bombs to cause 'multiple deaths.' "); Five Draw Long Sentences for Terrorism Schemes, N.Y. Times, Dec. 31, 1987, at A15, col. 1 ("Five members of one of the nation's deadliest street gangs have been sentenced to long prison terms for conspiring to acquire $2.5 million from Libya in exchange for their offer to commit terrorist acts in the United States."); U.S. Is Said to Detect Plans By Iran for Terrorist Attacks, N.Y. Times, Aug. 6, 1987, at A10, col. 1 ("United States intelligence has detected evidence that Iran may be preparing attacks on American installations abroad and possibly within the United States, Government officials said today."); Explosion Damages a G.E. Sales Office; Terrorists Suspected, N.Y. Times, Aug. 23, 1984, at B6, col. 4 ("A bomb apparently planted by a group opposed to United States policy in Central America exploded shortly before noon today outside a General Electric Company sales office."); New Blasts Show F.A.L.N. Resilience, N.Y. Times, Jan. 9, 1983, Sec. 1, at 29, col. 4 ("Through eight years of bombings and other violent actions, a small Puerto Rican armed force known as the F.A.L.N. has established itself as one of the most elusive and resilient terrorist groups ever to operate in the United States, according to Federal and local law enforcement officials.")
 Violence aimed at public officials is particularly frequent. See, e.g., Bomb Is Uncovered in Atlanta Office of Federal Court, N.Y. Times, Dec. 19, 1989, at A1, col. 6; Officials Say They Have Leads in Killing of Judge in Alabama, N.Y. Times, Dec. 18, 1989, at A1, col. 1 (describing investigation into assassination of United States Circuit Judge Robert S. Vance); Bomb Explodes in Senate's Wing of Capitol; No Injuries Reported, N.Y. Times, Nov. 8, 1983, at A1, col. 3; Reagan Wounded in Chest by Gunman; Outlook "Good" After 2-Hour Surgery; Aide and 2 Guards Shot; Suspect Held, N.Y.Times, Mar. 31, 1981, at A1, col. 3.
 
 
 [11]
 Ironically, the concurrence considers this view of the government's security interests to be "overblown," yet itself goes on to represent this dissent as concluding that "even speculative security interests are so significant as to justify almost any type of regulation." Ante at 1232. Such an assessment grotesquely mischaracterizes and distorts this dissent. Only a focal length of 150 feet (the spread between 75 yards and 25 yards) constitutes the entire jurisprudential difference between the majority and the dissent. The three-hour-long safety-and-security zone of 75 yards, therefore, is scarcely on an analytical par with the forcible internment of Japanese-Americans during World War II. The attempted conflation of this case with Korematsu cannot stand; excited references to emotionally charged symbols are of no assistance to good-faith analysis of the relevant constitutional issues
 The concurrence also fails to acknowledge that the government had an interest in maritime safety as well as in security. Repeated references to "terrorism" in the concurrence fail utterly to take into consideration the maritime-safety interest.
 Finally, the suggestion in the concurrence that the United States Coast Guard cannot be trusted to "arbitrate neutrally" because it presumably is in cahoots with the United States Navy to suppress free speech is hardly worthy of comment. Ante at 1231-1232. Suffice it to say that such allegations are entirely without support in the record, and not even the Bay Area Peace Navy has urged them upon this court. This unwarranted and disparaging depiction of the purposes and motivations of the nation's military and law-enforcement officials misrepresents legitimate differences among the parties about how certain competing interests are properly balanced under the Constitution.
 
 
 [12]
 It is probably true that the 75-yard safety-and-security zone would incidentally prevent effective presentation of theatrical performances of the type the Peace Navy conducted one year. This regrettable consequence scarcely makes the safety-and-security zone unconstitutional. First, the mere non-availability of one mode of expression as the result of a regulation does not, ipso facto, invalidate the regulation. The very application of the test indicates that at least one channel is not available; the inquiry is whether the remaining alternative channels were ample. Second, it is not even clear that effective theatrical performances will be possible with the 25-yard zone now permitted by the district court's permanent injunction. The Peace Navy introduced unrebutted testimony indicating that effective dramatic performances might not be possible from 25 yards. See R.T. at 44 (Feb. 22, 1988) (testimony of Robert Heifetz, Co-Coordinator for the Peace Navy) ("22-yards off the Pier was the distance that you should be, the distance between the performers in the last row and the stage and the assumption that the last row is the end of the Pier")