UNITED STATES of America, Plaintiff–Appellee,

v.

Pamela BAUGH; Benijamin Bear; Alan Beim; Lou Bordisso; Maria Brann; Mary Jane Brinton; Jesse Brown; Kenneth Butigan; Faye Butler; Christie Cannon; Robert Chamberlin; Gloria Channon; Norman Chase; James Corder; Robert Cox; Douglas Donley; Sile Dooley; Jennifer Dunlap; William Epsen; Arla Ertz; John Fay; Forest, AKA Gretchen Milne; Bernie Galvin; Margaret Gleason; Edward Gleason; Paul Grossberg; Mary Hein; Joan Hopkins; Jeff Johnson; Kathryn Jorgenson; Robert King; Barbara Kohn; Henry Kroll; Constance Kuruppu; Chris Latham; Kristi Laughlin; Angie Lobato; Louise Lynch; Eliose Magenheim; Joseph Mastrocola; Terry Messman; John Millen; Jean Monteton; Sident Moormeister; Innosanto Nagara; Kelly Neff; Norbert Nichols; Kathleen Niece; Michael Niece; William O'Donnell; Cynthia Okayama–Dopke; Karen Oliveto; Pamela Osgood; Debra Panek; Christine Panelli; John Pappas; Teresa Parent; Sarah Rock; Loretta Rowles; Mary Schone; Christine Smith; Ron Stief; Naomi Sultan; Gail Taylor; James Tracy; James Wagner; Janet Weil; P.E. Coffey, aka Whirlwind Dreamer; Carolyn Zito, Defendants–Appellants.

No. 98–10224.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1999

Filed Aug. 25, 1999

ment.

Dennis Cunningham, San Francisco, California, for the defendants-appellants.

George S. Cardona and Mark St. Angelo, Assistant United States Attorneys, San Francisco, California, for the plaintiff-appellees.

Before: SCHROEDER, REINHARDT, and SILVERMAN, Circuit Judges.

Opinion by Judge SCHROEDER; Concurrence by Judge SILVERMAN.

SCHROEDER, Circuit Judge:

Pamela Baugh and other members of a group called Religious Witness with Homeless People ("RWHP") appeal their convictions for demonstrating without a permit on National Park property, in violation of 36 C.F.R. § 2.51(a). At the time of their arrest, the defendants were protesting the Park Service's plan to demolish the Wherry housing in the Presidio in San Francisco instead of using the units to house the homeless.

The defendants challenge the constitutional validity of the permit regulation and its implementing rules both facially and as applied to their protest. We do not reach the facial challenge, for we hold that the Park Service's application of the regulation to the defendants violated the defendants' First Amendment rights.

### Facts and Procedural History

The demonstration for which the government arrested the defendants occurred on March 9, 1997. This was not the first time RWHP had protested the planned destruction of the housing that it wanted used to house the homeless. In past protests by the organization at the Presidio, after marching through the Wherry housing area, some RWHP members had trespassed into the housing and had refused to leave until they were arrested. On these occasions, the trespassing demonstrators were arrested both for demonstrating without a permit and for trespass, but were only prosecuted for trespass.

Park Police Lieutenant Kevin Hay learned of the March 9th demonstration a few days before. He telephoned Sister Bernie Galvin, executive director of RWHP, and asked her if the group wanted a permit. Lt. Hay told Sister Bernie that RWHP would receive a permit only if Sister Bernie promised that no trespassing into the units would occur at the march. Sister Bernie indicated that RWHP desired a permit but refused to promise that no trespassing would occur.

Although the earlier protests had taken place solely at the housing area, RWHP intended to convene on March 9th at the Visitor Center, in a different part of the Presidio, before going to the Wherry housing area to march. On March 9th, about 150 to 175 RWHP members gathered before the Visitor Center. Sister Bernie spoke to Lt. Hay two or three times at that location. He again made it clear that the permit would issue only if Sister Bernie would promise that none of the RWHP members would trespass into the housing units. Sister Bernie again refused to make this pledge.

Lt. Hay told Sister Bernie that the group would have to move to an area reserved for protestors known as the "First Amendment area" located 150 to 175 yards from the Visitor Center. Sister Bernie declined this option as well. She and other RWHP members believed that the designated area was located too far away from the Visitor Center to convey RWHP's message to Park Service officials and the public. Because of the Park Service's stance, the group gave up their march and decided instead to hold a prayer service where they stood: on the Visitor Center's lawn. Shortly after the inception of the prayer service, Lt. Hay made several announcements that the group would be arrested if it did not move to the First

Amendment area. Although some RWHP demonstrators went to the First Amendment area or crossed the street, those who remained in front of the Visitor Center were promptly arrested.

The record contains some indication that the protestors may have caused some disruption of Visitor Center activities, but the Park Service did not arrest defendants for this reason. It arrested defendants solely for not having a permit to engage in their expressive activities. According to Lt. Hay's testimony, the Park Service might have permitted the demonstration to go forward at a location much closer to the Visitor Center than the so-called First Amendment area had Sister Bernie been willing to negotiate further. Sister Bernie, for her part, testified that she did not believe she possessed this option.

The defendants moved to quash their arrests on the grounds that the arrests violated the First Amendment and the district court denied the motion. The court held that 36 C.F.R. § 2.51 and the Park Service's implementing regulations were constitutional on their face and as applied to the defendants. On April 13, 1998, after a one-day bench trial, defendants were convicted of demonstrating without a permit in violation of § 2.51(a). The district court held that the no-trespassing condition imposed by the Park Service constituted a reasonable condition for the permit. The district court sentenced the defendants to ninety days of unsupervised probation and twelve hours of community service.

### The Regulation and Its Implementing Rules

The Park Service regulates expressive activity at the Presidio under 36 C.F.R. § 2.51,[1] which is implemented through a

---

1. The permit regulation states in pertinent part:

§ 2.51 Public assemblies, meetings.

(a) Public assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views are allowed within park areas, provided a permit therefor has been issued by the superintendent.

(b) An application for such a permit shall set forth the name of the applicant; the date, time, duration, nature and place of the proposed event; an estimate of the number of persons expected to attend; a statement of equipment and facilities to be used and any other information required by the permit application form.

(c) The superintendent shall, without unreasonable delay, issue a permit on proper application unless:

(1) A prior application for a permit for the same time and place has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of that particular area; or

(2) It reasonably appears that the event will present a clear and present danger to the public health or safety; or

(3) The event is of such nature or duration that it cannot reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities.

(d) If a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial set forth.

(e) The superintendent shall designate on a map, that shall be available in the office of the superintendent, the locations available for public assemblies. Locations may be designated as not available only if such activities would:

(1) Cause injury or damage to park resources; or

(2) Unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones; or

(3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or

(4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or

(5) Present a clear and present danger to the public health and safety.

(f) The permit may contain such conditions as are reasonably consistent with protection and use of the park area for the purposes for which it is established. It may also contain reasonable limitations on the equipment used and the time and area within which the event is allowed.

(g) No permit shall be issued for a period in excess of 7 days....

compendium of Park rules. The permit regulation presumptively allows expressive activities, provided the Park superintendent has issued a permit in advance. *See* 36 C.F.R. § 2.51(a). The regulation further specifies that the superintendent shall, without unreasonable delay, issue a permit upon a proper application unless certain conditions apply. *See* § 2.51(c). One such condition is "[i]t reasonably appears that the event will present a clear and present danger to the public health or safety." *See* § 2.51(c)(2). Another condition is the inability to accommodate the event in the applied-for location due to the nature of the event and considering such factors as damage to park resources or facilities, damage to a protected area's atmosphere of peace and tranquility, or disturbance of program activities or public use facilities. *See* § 2.51(c)(3).

The regulation also provides that the superintendent should designate on a map the locations available for public assemblies. *See* § 2.51(e). These areas must be available for assemblies unless, *inter alia,* the activities would cause injury or damage to park resources; unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; substantially interfere with the operation of public use facilities; or present a clear and present danger to the public health and safety. *See* § 2.51(e).

The compendium of implementing regulations designates three locations within the Presidio for which the Park Service will issue permits for First Amendment activities. If a group wishes to stage a special event, it may apply to the superintendent for the designation of an additional First Amendment area. If the criteria in the regulations are complied with, the superintendent will designate another specific location for the exercise of First Amendment activities. At trial, a Park Service official testified that he had the authority to issue floating permits to groups who applied and who wished to hold First Amendment activities that warranted such a permit.

### Standing

While engaged in purely expressive conduct that did not violate the Park Service's no-trespassing condition, defendants were arrested because they lacked a permit the Park refused to issue unless defendants promised not to trespass. We must decide whether the arrests violated the defendants' First Amendment right to free speech.

■ Before reaching this question, however, we must first address the threshold issue of standing. The government does not question the defendants' standing to make a facial challenge because one need not apply for a benefit conditioned by a facially unconstitutional law. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The government, however, does contend that the defendants may not make an as-applied challenge because they did not apply for a permit for their prayer service.

In *Madsen v. Boise State University,* we held that generally one may not challenge a rule or policy to which one "has not submitted himself by actually applying for the desired benefit." 976 F.2d 1219, 1220

(h) It is prohibited for persons engaged in activities covered under this section to obstruct or impede pedestrians or vehicles, or harass park visitors with physical contact.

(i) A permit may be revoked under any of those conditions, as listed in paragraph (c) of this section, that constitute grounds for denial of a permit, or for violation of the terms and conditions of the permit. Such a revocation shall be made in writing, with the reason(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension may be made to be followed by written confirmation within 72 hours.

(j) Violation of the terms and conditions of a permit issued in accordance with this section may result in the suspension or revocation of the permit.

(9th Cir.1992); *see also United States v. Hugs,* 109 F.3d 1375, 1378 (9th Cir.1997); *Gerritsen v. City of Los Angeles,* 994 F.2d 570, 575 (9th Cir.1993). A central reason for this requirement is to ensure that the challenged policy actually affected the person challenging it. *See Madsen,* 976 F.2d at 1221–22.

There is no reason to require a formal written application when the record reflects, as it does here, that the Park Service itself initiated less formal discussions with RWHP on March 9th and on prior occasions. This practice demonstrated that the Park Service had declined to insist on the formal application process outlined in § 2.51, instead endeavoring to contact RWHP and negotiate on the terms of a permit. *See Gerritsen,* 994 F.2d at 578 (because city in practice did not require that bond be submitted before application reviewed, the failure to submit a timely bond did not invalidate as-applied constitutional challenge). The defendants engaged in this informal process, encouraged by the Park Service officials, and defendants expressed their desire for a permit for their march. Defendants initiated their prayer service as a direct consequence of the Park Service's refusal to issue a permit for the march. They thus have standing to challenge the permit requirement as the Park Service applied it to their prayer service.

### The Constitutionality of the Regulation as Applied

A march and other protest activities clearly constitute protected speech. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (describing the privilege of citizens to assemble, parade, and discuss public questions in streets and parks). We have stressed that a public park, such as the Presidio, represents a "quintessential public forum[ ]." *See Grossman v. City of Portland,* 33 F.3d 1200, 1204 (9th Cir. 1994). "Parks ... have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing

public questions." *Id.* at 1204–05 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)) (internal quotations omitted). Thus, the First Amendment applies with particular force here. *See United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

The refusal of the Park Service to authorize any expressive activity in the Presidio absent the defendants' promise to keep out of certain areas constitutes a "prior restraint" that prevented expressive activity from occurring. Prior restraints on speech bear a heavy presumption of unconstitutionality because they "are the most serious and the least tolerable infringements on First Amendment rights." *Grossman,* 33 F.3d at 1204 (quoting *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (internal quotations omitted)). However, even prior restraints may be imposed if they amount to reasonable time, place, and manner restrictions on speech. *Id.* at 1205. To qualify as a permissible restriction, the regulation must be content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the message. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1226 (9th Cir.1990).

We are not the first court to consider this regulatory scheme. The few decisions have not been uniform.

In *United States v. Kistner,* 68 F.3d 218 (8th Cir.1995), the Eighth Circuit examined § 2.52, the companion regulation to § 2.51 that pertains to pamphleting and that contains similar language. The court held that the regulation did not violate the First Amendment on its face nor as applied to the defendant. *Id.* at 220–23. The defendant in *Kistner* had been arrested for distributing religious pamphlets

without a permit in Jefferson National Expansion Memorial, in St. Louis. *Id.* at 219. The pro se defendant broadly argued that the latitude given to park officials by the regulation created a risk that the discretion would be exercised based on the content of speech. *Id.* at 221. *Kistner* rejected this argument, finding that the regulation contained guidelines for the issuance of the permit and that the record belied the defendant's contention that the park granted and denied permits based on content. *Id.*

Two district courts, however, have found similar permit schemes to the one that confronts us unconstitutional on their face. *See Naturist Soc'y v. Fillyaw,* 858 F.Supp. 1559 (S.D.Fla.1994); *United States v. Rainbow Family,* 695 F.Supp. 294 (E.D.Tex.1988). Both courts held that the regulations were unduly vague and thus bestowed too much discretion upon park officials because, *inter alia,* the provisions in the regulations allowed park officials to deny permits if they perceived that the demonstration presented "a clear and present danger." *Naturist Soc'y,* 858 F.Supp. at 1569–70; *Rainbow Family,* 695 F.Supp. at 311–12.

■ The regulation before us also authorizes denial of a permit on grounds of "clear and present danger." *See* § 2.5.1(c)(2). The government in part relies on this subsection to justify its refusal to issue RWHP a permit absent a promise not to trespass. We need not reach the issue of the facial constitutionality of § 2.51, however, because we hold that even if the regulation on its face created reasonable time, place, and manner constraints, the Park Service unconstitutionally applied the requirement when it refused to issue a permit for any expressive activity in this case.

■ The first criteria for a reasonable restriction on speech is that the restriction be content neutral, or " 'justified without reference to the content of the regulated speech.' " *One World One Family Now v. City of Honolulu,* 76 F.3d 1009, 1012 (9th Cir.1996) (quoting *Clark,* 468 U.S. at 293,

104 S.Ct. 3065). This requirement appears to have been met. Lt. Hay testified that the Park Service insisted on the promise of no trespassing out of a concern for preventing property damage and protecting the safety of protesters who might injure themselves by trespassing into the uninhabited Wherry houses. These concerns did not stem from the underlying content of RWHP's message. An isolated remark by a Park Major that indicated disagreement with RWHP does not alone suffice to undermine this conclusion. *Cf. Kistner,* 68 F.3d at 223 (rejecting a similarly unsubstantiated claim of content bias). The government had a significant interest in protecting the Presidio's facilities and its users, including the protesters. *See, e.g., Ward,* 491 U.S. at 797, 109 S.Ct. 2746; *Clark,* 468 U.S. at 297, 104 S.Ct. 3065.

■ The critical question is whether the requirement that Sister Bernie promise that no trespassing would occur before the Park Service would issue RWHP a permit was sufficiently narrowly tailored to constitute a valid First Amendment restriction. A narrowly tailored requirement need not be the least restrictive means of furthering the Park Service's interests, but the restriction may not burden substantially more speech than necessary to further the interests. *See Ward,* 491 U.S. at 799, 109 S.Ct. 2746; *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). To do otherwise would be to burden substantially those seeking to express their political views. Organizers of protests ordinarily cannot warrant in good faith that all the participants in a demonstration will comply with the law. Demonstrations are often robust. No one can guarantee how demonstrators will behave throughout the course of the entire protest. Thus, the promise the Park Service sought would be illusory and meaningless at best.

We have held that a complete ban on First Amendment activity cannot be justified simply because past similar activity

led to violence. *See Collins v. Jordan,* 110 F.3d 1363, 1371–72 (9th Cir.1996). In *Collins,* this court disapproved of a San Francisco policy instituted in the days following the Rodney King verdict, to disperse demonstrations before the demonstrators acted illegally or posed any threat to other people or activities. *Id.* at 1366–68. We stated that "[t]he generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Id.* at 1371–72; *cf. Kunz v. New York,* 340 U.S. 290, 294–95, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Schneider v. New Jersey,* 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The Park Service, in lieu of restraining the expressive activity by refusing to issue the permit, should have issued the permit for the lawful expressive activity and then arrested the demonstrators if and when they trespassed. *See Frisby,* 487 U.S. at 485, 108 S.Ct. 2495 ("A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil."); *Ward,* 491 U.S. at 799–800, 109 S.Ct. 2746.

The Supreme Court's decision in *Clark,* 468 U.S. at 292, 104 S.Ct. 3065, illustrates the point. In that case, a group wished to draw attention to the plight of homelessness by holding a day and night wintertime demonstration in Lafayette Park and on the Mall in Washington, D.C. 468 U.S. at 291–92, 104 S.Ct. 3065. The Park Service granted the group a permit to erect two symbolic tent cities. *Id.* at 292, 104 S.Ct. 3065. However, the Park Service refused to grant the group's request for a permit allowing the demonstrators to sleep in the tents. The Supreme Court held that the limitation the Park Service placed on the permit constituted a valid restriction on the manner of the demonstration. *Id.* at 294, 297–98, 104 S.Ct. 3065. The Park Service in *Clark* issued the permit to allow a lawful demonstration to go forward. *Id.* at 292, 104 S.Ct. 3065. It did

not withhold the right to any demonstration.

In this case, by failing to tailor the no-trespass condition narrowly to allow for lawful demonstrations, the Park Service also failed to leave open sufficient alternative means for the protestors to communicate their views. Lt. Hay ordered the demonstrators to a First Amendment area 150 to 175 yards away from the Visitor Center. The Park Service officials and the public to whom RWHP wished to communicate its message were at the Visitor Center. Such distancing of the demonstrators from the intended audience does not provide a reasonable alternative means for communication of RWHP's views. In *Bay Area Peace Navy,* we held that requiring a 75–yard security zone between demonstrators and the persons to whom they directed their message did not leave open ample alternative means of communicating the protesters' message. 914 F.2d at 1229. We stated that "[a]n alternative is not ample if the speaker is not permitted to reach the 'intended audience.'" *Id.* (citation omitted); *see also Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" (citation omitted)); *cf. Schenck v. Pro–Choice Network of W.N.Y.,* 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (floating buffer zones prevent abortion protesters from communicating their message). Because RWHP was left with no alternative that allowed it to reach its intended audience, the Park Service's application of the permit regulations also failed to satisfy the final requirement for valid First Amendment restrictions.

The judgment is REVERSED with instructions to VACATE defendants' convictions and sentences.

SILVERMAN, Circuit Judge, concurring:

On March 9, 1997, the defendants set out to get arrested at the Presidio to generate publicity for their cause. They admit that. They could have obtained the requisite permit if they would have agreed to comply with the permit. They admit that, too. They could have demonstrated in the First Amendment area of the Presidio without any permit whatsoever. That, also, is admitted. The problem is that if the defendants had agreed to comply with the permit or to hold their demonstration in the First Amendment area, they wouldn't have gotten themselves arrested, which is what they wanted to accomplish to begin with. It is in the context of this contrived, intentionally provoked controversy that the defendants attack both the facial constitutionality of 36 C.F.R. § 2.51(a) and the constitutionality of that section as applied.

Although I agree with the result reached by the majority, I write separately to express some sympathy for the situation faced by the officers of the Park Service in this case. Contrary to the main opinion's dramatic overstatement, the Park Service officers did not prohibit the defendants from engaging in "any expressive activity in the Presidio" on the day in question. They could have expressed themselves to their hearts' content in the First Amendment area. The First Amendment area was not Siberia. It was located only 150 yards or so away, and in view of, the Visitors Center.

Likewise, the Park Service officers were ready, willing and able to issue a floating permit so that the defendants could conduct their demonstration elsewhere in the Presidio if they would have agreed to comply with it. And as the main opinion acknowledges, the denial of the permit was content-neutral, i.e., "did not stem from the underlying content of [the defendants'] message."

The Park Service certainly had plenty of reason to believe that the organizers of the demonstration *intended* to violate the very permit for which they were applying. As Sister Bernie testified, at the time Lt. Hays asked for an assurance that the permit would be complied with, "He had a copy of our press release that had gone out earlier which also indicated that we were going to do civil disobedience. * * * We couldn't agree to the condition of no civil disobedience and we found being relegated to a remote area where we indeed could not witness was simply unacceptable."

In retrospect, what the Park Service should have done is issue the permit, await its advertised violation, and then make the arrest. The Park Service should not have denied the permit just because it anticipated a violation. However, one certainly can understand why conscientious officers, concerned with the public safety and the protection of park property, would want to try to head off a 150–person trespass, if possible. Although it is difficult to articulate when threatened First Amendment activity might create such a clear and present danger to public safety that it can be prevented in advance, Sunday in the park with Sister Bernie was not such a case.