SERVICE EMPLOYEE INTERNATIONAL UNION, Local 660; D2K Convention Planning Coalition; L.A. Coalition to Stop the Execution of Mumia Abu–Jamal; National Lawyers Guild, Los Angeles Chapter; Jennafer Waggoner; and Tom Hayden, Plaintiffs,

v.

CITY OF LOS ANGELES, Chief Bernard Parks, in his official capacity as chief of the Los Angeles Police Department; Commander Thomas Lorenzen, in his official capacity as commanding officer of the Los Angeles Police Department's DNC 2000 Planning Group; and the Los Angeles Police Commission, Defendants.

No. CV 00–7119–GAF.

United States District Court, C.D. California.

July 20, 2000.

Daniel P. Tokaji, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, CA, Carol A. Sobel, Law Offices of Carol A. Sobel, Santa Monica, CA, Robert T. Myers, Newman, Aaronson Vanaman, Pasadena, CA, Karl M. Manheim, Loyola Law School, Los Angeles, CA, for plaintiffs.

James K. Hahn, City Attorney, Cecil W. Marr, Senior Assistant City Attorney, Debra L. Gonzales, Laurie Rittenberg, Deputy City Attorneys, Los Angeles, CA, for defendants.

## MEMORANDUM AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION

FEESS, District Judge.

## I.

## INTRODUCTION AND SUMMARY

The 2000 Democratic National Convention is scheduled to take place at the Staples Center, 1111 South Figueroa Street, from August 14 through August 17. For a period of time prior to and after the convention, the Los Angeles Police Department, in conjunction with convention planners, the United States Secret Service and other agencies, has designated a "secured zone" around the Staples Center, defined by Olympic Boulevard on the north, Venice Boulevard on the south, the Harbor Freeway on the west and Flower Street on the east—an area of more than 8 million square feet encompassing numerous streets, sidewalks and buildings.

North of Olympic Boulevard, some 260 yards from the entrance to the Staples Center, a small "protest" or "demonstration" site has been designated for use during the convention. Defendant City of Los Angeles defends the expansiveness of the "secured zone" and the location of the protest site on the basis of security concerns.

Plaintiffs consist of a number of groups who wish to engage in a variety of expressive activities during the convention including marches, speeches, picketing and leafletting. They contend that the "secured zone," and various permit schemes, deny them their First Amendment rights of speech and assembly. They move this Court for a preliminary injunction: (1) barring enforcement of the "secured zone" as presently constituted; (2) ordering the defendants to issue permits to three different groups who wish to march during the convention; and (3) precluding enforcement of LAMC § 103.111 and the "Permit Procedure for the Department of Recreation and Parks" during the pendency of the present action.

The Court has now read and fully considered all of the moving and opposition papers of the parties, the evidence and authorities cited therein, and the argument of counsel at the hearing on this motion. Based on the foregoing, the Court GRANTS the motion for the reasons set forth below.

## II.

## FACTUAL BACKGROUND

### A. *Plaintiffs' Planned Speech Activities*

#### 1. *Service Employees International Union*

The Service Employees International Union, Local 660 ("SEIU") is a labor union planning on holding a march and rally entitled "Fair Share for Los Angeles County's Working Families" on August 15. (Diener Dec., ¶¶ 5–7.)

#### 2. *D2K Convention Planning Coalition*

D2K is a coalition of grassroots community groups who joined to coordinate a community response to the Democratic

National Convention. (White Dec., ¶ 2.) D2K has applied for a permit to parade from Pershing Square to the corner of 11th and Figueroa Streets, as well as for a permit to use Pershing Square on August 14. (White Dec., ¶ 4–5.) The City has denied the request to use Pershing Square due to a previously scheduled event, but has granted the permit to march to 11th and Flower Streets (outside of the "secured zone"). The permit is conditioned on D2K paying fees to the Department of Transportation for installing parking restriction signs and traffic control devices, and informing the police and the Department of Transportation of D2K's alternative dispersal plan.

### 3. L.A. Coalition to Stop the Execution of Mumia Abu–Jamal

The L.A. Coalition to stop the Execution of Mumia Abu–Jamal ("Mumia Coalition") is a non-profit organization protesting the death penalty generally and the scheduled execution of Abu–Jamal specifically. (Antouian Dec., ¶ 5.) The Mumia Coalition is planning on conducting a rally and march on August 13 from Pershing Square to the corner of 11th and Figueroa Streets. (Antouian Dec., ¶ 9.) The permit has been granted subject to the same conditions described above.

### 4. National Lawyers Guild, Los Angeles Chapter

The National Lawyers Guild is a human rights bar association. (Lafferty Dec., ¶ 2.) The Guild plans on monitoring the DNC protests and offering legal services for people who are arrested. (Id.) Members of the Guild plan on participating in planned and spontaneous demonstrations. (Anderson–Barker Dec., ¶ 3.)

### 5. Jennafer Waggoner

Ms. Waggoner is a community activist and editor of a street-newspaper called Making Change. (Waggoner Dec., ¶¶ 3–4.) The current issue of Making Change was produced with the specific purpose of distributing it to delegates at the Convention. (Waggoner Dec., ¶ 5.)

### 6. Senator Tom Hayden

Senator Hayden is a delegate to the Convention who is interested in both seeing the demonstrations and participating in peaceful protests. (Hayden Dec., ¶¶ 2, 5–6.)

### B. The "Secured Zone"

Concerned about the safety of the government officials, convention delegates and employees of the convention, the defendants have set up a "secured zone" which may only be accessed by people who possess a ticket issued by the Democratic National Convention Committee or those who possess a credential issued by the United States Secret Service. (Koerner Dec., ¶ 9.)

The boundaries for the zone are: Olympic Boulevard on the north, Flower Street on the east, Venice Boulevard on the south, and the 110 Freeway on the west. (Vasta Dec., ¶ 7.) There will be a physical barrier around the zone. (Lorenzen Dec., ¶ 15.)

### C. The Official Demonstration Site

Defendants have also established an "Official Demonstration Site" on the north side of Olympic Boulevard, between Georgia and Francisco Streets. (Lorenzen Dec., ¶ 21.) Demonstrators are not required to use this site, (Lorenzen Dec., ¶ 26), but are precluded from engaging in any expressive activities within the "secured zone." The site is offered by defendants and will include a platform, a sound system and portable toilets. (Lorenzen Dec., ¶ 21.) The site faces Olympic Boulevard, looks across the "media village" (Parking Lots 2 and 3) and has a "sight line" to the Staples Center. (Lorenzen Dec., ¶ 22.)

## III.

## LEGAL ANALYSIS

### A. Standards

#### 1. Preliminary Injunction Standard

■ A preliminary injunction should be granted only if (1) there is a combination

of plaintiffs' probable success on the merits with the possibility of irreparable injury to them; or (2) there are serious questions and the balance of hardships tips in plaintiffs' favor. *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 732 (9th Cir.1999).

■■■ The issue of probable success on the merits must be viewed in light of the respective burdens of the parties at trial. Since the issue before the Court involves the validity of restrictions that impact on First Amendment rights, the defendants have the ultimate burden of establishing that: (1) restrictions on the exercise of those rights was "narrowly tailored" to achieve a significant governmental interest; and (2) ample alternative channels are available for the exercise of those rights. *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1227 (9th Cir.1990)("The government bears the burden of proving that the 'narrowly tailored' and 'alternative communication' prongs are satisfied.") Thus, in this case, the plaintiff shows probable success on the merits by establishing facts that would create a high probability that the government cannot meet its burden on one or both prongs of the applicable test. As explained below, the Court concludes that plaintiff has made such a showing.

### 2. First Amendment Standards

There is no dispute that the sidewalks and streets within the "secured zone" are traditional public fora. *See, e.g., Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988). There is also no dispute that defendants have legitimate public safety concerns for which some security measures may be taken. *See, e.g., Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965).

■■■ Government regulation of speech in traditional public fora is subject to the highest constitutional scrutiny. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). This is especially true where, as here, the government seeks to impose a prior restraint on speech. *Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968); *United States v. Baugh,* 187 F.3d 1037, 1042 (9th Cir.1999). The government bears the burden of proving that a prior restraint on speech is constitutional. *N.A.A.C.P., Western Region v. City of Richmond,* 743 F.2d 1346, 1354 (9th Cir. 1984).

### B. Unconstitutionality of The "Secured Zone"

■■ In order to satisfy the First Amendment, the delineation of the "secured zone" (1) must be content neutral; (2) must be narrowly tailored to serve a significant government interest; and (3) must offer ample alternative channels of communication. *Bay Area Peace Navy,* 914 F.2d at 1227. The Court assumes for purposes of its analysis that the "secured zone" is content neutral.[1]

---

1. While neither side argues that the "secured zone" is a content-based restriction, the Court has its doubts regarding the zone's neutrality. The "secured zone" is not a "no speech" zone, nor is it a "no access" zone. Free expression is permitted within the zone to those who have access; however, the only people with access are those chosen by the Democratic National Convention Committee. (Koener Dec., ¶ 9)(access restricted to "those who possess a ticket issued by the Democratic National Convention Committee"). Defendants assert that the zone is not a content-based restriction because *some* Democrats will be denied access to the zone. While this may be true, such argument ignores the fact that *all* non-democrats will be denied access.

In addition, neither party argues that the "secured zone" violates the Equal Protection Clause. *See Carey v. Brown,* 447 U.S. 455, 461–63, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980) (Equal Protection clause prevents government from granting use of forum to those whose views it finds acceptable, but denying access to those with less-favored or more controversial views). Because the

### 1. The "Secured Zone" is Not Narrowly Tailored to Serve a Significant Government Interest

■ Protecting the safety of all people present in the Staples Center area during the Convention is undoubtedly a significant government interest. *Cox*, 379 U.S. at 554, 85 S.Ct. at 464.[2] As important as preservation of the public peace is, "'this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution.'" *Cooper v. Aaron*, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958) (quoting *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917)). Even when public safety is at stake, the government must choose a narrowly tailored response. *Ward v. Rock Against Racism*, 491 U.S. 781, 797–99, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989). While "narrowly tailored" does not require the government to choose the least-restrictive means of serving its interest, a regulation must not be substantially broader than necessary. *Id.*

■ The government cannot infringe on First Amendment rights on the mere speculation that violence *may* occur. *Collins v. Jordan*, 110 F.3d 1363, 1373 (9th Cir.1996); *Bay Area Peace Navy*, 914 F.2d at 1228. As the *Collins* Court stated:

> [E]njoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation. [Citations.] The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from oc-

curring in order to obviate the possible unlawful conduct. [Citations.]

*Id.* at 1371. As the Ninth Circuit observed in *Bay Area Peace Navy:*

> Although the government legitimately asserts that it need not show "an actual terrorist attack or serious accident" to meet its burden, it is not free to foreclose expressive activity in public areas on mere speculation about danger. [Citations.] *Otherwise, the government's restriction of first amendment expression in public areas would become essentially unreviewable.*

914 F.2d at 1228. (Emphasis added.)

The ban in issue must be viewed in light of this case law. First, the area to be cordoned off covers approximately 185 acres of land surrounding the Convention site. Its configuration prevents anyone with any message, positive or negative, from getting within several hundred feet of the entrance to the Staples Center where delegates will arrive and depart. While there is no dispute that a narrowly tailored no activity zone is constitutionally permissible in order to ensure that delegates can enter and exit the Staples Center safely,[3] the "secured zone" covers much more area than necessary to serve this interest. And although it may be more convenient for delegates to have exclusive access to the immediate area, convenience can never predominate over the First Amendment.

Furthermore, the time restriction is absolute: regardless of activity occurring at the Staples Center, the "secured zone" will block expressive activities 24 hours a day. In addition, although the Convention activity at the Staples Center will not begin

---

Court finds the zone unconstitutional on First Amendment grounds even if it assumes content neutrality, it need not address these issues.

**2.** Defendants do not suggest that the protestors' speech per se creates safety dangers. Rather, defendants seek to safeguard against risks generally associated with (1) the presence of prominent people; (2) the fact that Convention is a real and symbolic target for

terrorist activity; and (3) the fact that a large media concentration may encourage groups to become violent to attract attention to their cause. (Lorenzen Dec., ¶ 7; Koener Dec., ¶ 10 .)

**3.** For example, plaintiffs do not seek an order allowing them on the sidewalk that immediately surrounding the Staples Center. Motion at 2.

until August 14 (Ibarra Dec., Exh. 3b), the "secured zone" will be erected on August 11. *See* Opp. p. 1. Thus, there has been no attempt to provide some reasonable accommodation regarding the timing of demonstrations.

Finally, the "manner" of speech is not addressed by the plan because the intent is to preclude all speech activities by non-invitees within the secured zone. Thus, there is again no attempt made to accommodate or balance the speech interests of the protestors against the need for security at the Convention site.

█ These extreme limitations are based on and justified by defendants' concerns that violence may occur at the Convention site, and on the premise that dealing with a worst case scenario must be given priority in the balancing of the competing interests. While the concerns are no doubt real, First Amendment jurisprudence teaches that banning speech is an unacceptable means of planning for potential misconduct. *E.g., Collins,* 110 F.3d at 1372–73. Thus, the extensive ban currently in place does not survive constitutional scrutiny.

### 2. The "Official Demonstration" Area Does Not Provide Adequate Alternative Means of Communication

█ Likewise, defendants' "Official Demonstration" area is not a sufficient alternative channel of communication to accommodate First Amendment interests. An alternative channel is not sufficient if the speakers are not permitted to reach their intended audience. *Bay Area Peace Navy,* 914 F.2d at 1229. Recognizing this, the Ninth Circuit has struck down a number of "First Amendment zones." *See id.* (75–yard "safety zone" between demonstrators and intended audience did not leave open alternative channel of communication); *Baugh,* 187 F.3d at 1044 (150–175 foot "safety zone" inadequate alternative means of communication).

The plaintiffs have made clear that their intended audience is the Convention delegates and attendees. (*See, e.g.,* Diener Dec., ¶ 4; White Dec., ¶ 2.) Since they are the ones who will determine the party's platform, nominate its candidate for president, and who include in their ranks many elected officials, one can hardly contend that the desire to reach this audience is frivolous. On the contrary, the speech activities at issue in the case and the proposed location of those activities rest at the very core of the First Amendment. Few events in this country's national political life are more significant than the quadrennial conventions of the two major political parties. Yet defendants' plan would keep the protestors 260 yards away from those who are the decision makers in this quintessential political affair. *See* Bohl Dec., ¶ 7. While defendants claim that there is a "sight line" from the Demonstration Area to the Staples Center, the distance ensures that only those delegates with the sharpest eyesight and most acute hearing have any chance of getting the message, that is, assuming that the "sight line" is not blocked during the convention. This is a questionable assumption because it does not account for the fact that, between the Staples Center entrance and the Demonstration Area, there will be a "media village" housing 10,000 members of the media with their equipment (such as staging facilities and a large screen TV). *See* Lorenzen Dec., ¶¶ 7, 22; *see also* Vasta Dec., ¶ 12. Thus, it is likely that the delegates will not be able to see or hear messages conveyed in the "Official Demonstration" area. In short, at this crucial political event, those who do not possess a ticket to the convention cannot get close enough to the facility to be seen or heard. The First Amendment does not permit such a result.

The Court notes that there appears to be no constitutional infirmity in the southern or western borders of the "secured zone," or in banning all unauthorized vehicles from the "secured zone" given the peculiar security problems posed by vehicles. Likewise, the Court sees no constitutional defect in the northwest or southeastern borders of the zone. The problem lies in the blanket preclusion of persons from

the area to the north and east of the Staples Center entrance where delegates enter and leave the facility. Any scheme that precludes plaintiffs from effectively communicating with those delegates will not withstand constitutional scrutiny.

### C. *Unconstitutionality of Permit Laws*

In addition to challenging the "secured zone," plaintiffs challenge the City's parade and park use permit procedures as facially unconstitutional. Plaintiffs have standing to challenge the procedures regardless of whether or not they applied for a permit. *See S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir.), *amended* 160 F.3d 541 (9th Cir.1998) (general rules regarding standing are disregarded in First Amendment cases because unconstitutional laws may have universal chilling effect).

#### 1. *The Parade and Park Use Procedures*

##### a. *Municipal Code § 103.111*

Los Angeles Municipal Code § 103.111 governs parades. A "parade" is defined as a gathering "which does not comply with normal and usual traffic regulations or controls." § 103.111(a)(1). The Code requires all parade applications to be made no less than 40 days before the parade, although the Board has the "authority, in its discretion, to consider any application for a permit to conduct a parade which is filed less than 40 days before the date" of the parade. § 103.111(d) and (*o*). Obtaining a permit requires a rather elaborate process for which the applicant must appear for a hearing· before the Board. § 103.111(f). The permit will be denied if the applicant does not appear at the hearing or if the applicant refuses to abide by all the conditions set by the Board. § 103.111(i)(2) and (4). The Board is permitted to condition the permit on compliance with requirements that "are found by the Board to be reasonably necessary for the protection of persons or property and control of other traffic." § 103.111(g). Finally, the Board may revoke the permit

"when by reason of disaster, public calamity or other emergency, such Board determines that the safety of persons or property demands such revocation." § 103.111(r).

##### b. *Park Permit Procedure*

A person or group of people who engage in conduct "which has the effect, purpose or propensity to draw a crowd of onlookers" is required to obtain a park permit. Permit Procedure II and III(k). The permit application must be made at least five days in advance. Permit Procedure IV. Upon submitting an application, the permit is presumed granted. *Id.* However, it may be denied or revoked if there appears to be "a clear and present danger to the public's safety, welfare, or health." Permit Procedure VII and XVI.

#### 2. *The Municipal Code is Unconstitutionally Overbroad*

##### a. *The 40–day Advance Notification*

Procedures requiring advance notification have the potential to reduce speech drastically because they impose both a procedural hurdle of submitting an application and a temporal hurdle of waiting for a response. *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir.1994). While certain demonstrations require notification so that the City may ensure peace and safety, a delicate balance must be reached to ensure that free speech is not unduly limited.

Municipal Code § 103.111 places a hefty burden on potential speakers, requiring them to apply for a permit over one month before their planned expressive activity. Such a lengthy requirement is patently unconstitutional. *Cf. Grossman*, 33 F.3d at 1206 (seven-day advance notification unconstitutional); *cf. also City of Richmond*, 743 F.2d at 1353–56 (noting that, empirically, many cities (including New York and San Francisco) can protect their interests in less than 36 hours).

This facial defect is not cured by the Board's discretion to waive the 40–day re-

quirement, because there are no rules governing the exercise of the Board's discretion. Permitting the Board to have unfettered discretion to grant or deny a permit is an unconstitutional exercise of prior restraint. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).[4]

### b. The "Conditions" Provisions

■ Plaintiffs also challenges the Municipal Code's provisions permitting the Board to condition a permit on requirements the Board finds to be "reasonably necessary for the protection of persons or property and control of other traffic[.]" The Court finds nothing facially unconstitutional regarding that provision. However, it appears that this provision has been applied here to condition the issuance of plaintiffs' permits on payments to the Department of Transportation for installing parking restriction signs and traffic control devices.

■ The Municipal Code does not specify how or when Department of Transportation fees are to be assessed or what guidelines are to be used to determine whether to condition a permit on payment of such fees. In essence, the Department and the Board have total discretion to determine who must pay these fees. Such unfettered discretion is facially unconstitutional because it creates a substantial risk that fees will be charged based upon the context of the intended expressive activity, which violates the First Amendment. *Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).[5]

### 3. The Park Procedures Are Unconstitutionally Vague and Overbroad

■ In addition, the procedures for obtaining a park permit are unconstitutional. The procedures require a permit for activity

> engaged in by one or more persons, the conduct of which has the effect purpose or propensity to draw a crowd of onlookers.

Permit Procedure III(k). First, the language is overbroad and permits content-based decision making. By tying the permit requirement to the reaction of other park users, rather than the need for City services, the procedures necessarily discriminate against expressive speech generally and against certain types of speech specifically. *See Grossman,* 33 F.3d at 1207; *see also Forsyth County, Georgia,* 505 U.S. at 134, 112 S.Ct. at 2403 ("Listeners' reaction to speech is not a content-neutral basis for regulation").

Second the procedures are vague as there are no concrete criteria for determining whether a permit is required. For example, how many people constitute a "crowd"? Two? Ten? One hundred? The language is insufficient to give any guidance to those who wish to exercise their First Amendment rights or those who seek to enforce the permit requirements. Such language will not withstand constitutional scrutiny.

### IV.

### FINDINGS AND ORDER

The Court finds that plaintiffs have shown a strong likelihood of prevailing on the merits and that, if defendants are not enjoined pending a final determination on

**4.** Defendants assert that the Board has exercised its discretion in good faith and has always considered late petitions. While this may be true, it is not sufficient to save the statute. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 769–70, 108 S.Ct. 2138, 2150–51, 100 L.Ed.2d 771 (1988) (statute permitting unbridled discretion cannot be saved by mere presumption that government actor will act in good faith; court cannot write nonbinding limitations in silent statutes).

**5.** Indeed, it appears that while the protestors here, who wish to engage in constitutionally protected core speech activities, are being required to pay costs that were not imposed on the sponsors of the Los Angeles Lakers victory celebrations or on the celebrants who attended.

the merits of this action, plaintiffs will suffer irreparable injury from loss of their First Amendment rights.

The Court finds that the sidewalks and streets contained within the designated "secured zone" (bounded by Olympic Boulevard on the north, Flower Street on the east, Venice Boulevard on the sough, and the 110 Freeway on the west) are traditional public fora for the exercise of First Amendment rights. While defendants have a significant government interest in providing security to those attending the convention, the Court finds that the proposed "secured zone" surrounding the Staples Center is not narrowly tailored to serve that interest because it burdens more speech than is necessary. The Court further finds that defendants' proposed "Demonstration Site" is not an adequate alternative for communication to the delegates and Democratic Party officials at the Staples Center.

The Court further finds that LAMC § 103.111, regulating parades, marches and processions, is unconstitutional on its face because it imposes an unjustified prior restraint in the form of a lengthy prefiling requirement and because it vests public officials with unbridled discretion to implement terms and conditions on the permit in an impermissible content-oriented basis.

The Court further finds that the City's "Permit Procedure for the Department of Recreation and Parks" is unconstitutional on its face because the regulations impose a prior restraint on all expressive activity in public parks based on the intent of speakers to communicate their views on an unlimited range of issues. The Court further finds that the park permit scheme is unconstitutional because it vests public officials with unbridled discretion to implement the terms and conditions of the permit scheme.

THEREFORE, IT IS ORDERED as follows:

(1) That Defendants, their officers, agents, employees, successors, and those in active concert with them are hereby enjoined from enforcing the "secured zone" as presently constituted and are hereby directed to reconfigure that area to comply with the terms of this Court's Memorandum and Order;

(2) That Defendants, their officers, agents, employees, successors, and those in active concert with them are to issue forthwith the march and rally permits applied for by Plaintiffs D2K CONVENTION PLANNING COALITION, L.A. COALITION TO STOP THE EXECUTION OF MUMIA ABU–JAMAL, and SERVICE EMPLOYEE INTERNATIONAL UNION, LOCAL 660, for a route starting in downtown Los Angeles, proceeding to an area near the Staples Center within the present "secured zone" as reconfigured in accordance with Paragraph (1) above. Consistent with the requirements of this order, reasonable time, place and manner restrictions may be placed on the marchers;

(3) That Defendants, their officers, agents, employees, successors, and those in active concert with them are enjoined from enforcing the LAMC § 103.111 during the pendency of this action; and

(4) That Defendants, their officers, agents, employees, successors and those in active concert with them are preliminarily enjoined from enforcing the City's "Permit Procedure for the Department of Recreation and Parks" during the pendency of this action, including enforcement of this procedure as to Pershing Square Park.

IT IS FURTHER ORDERED THAT the requirements of Fed.R.Civ.P. 65(c) are waived as the Court finds that the Defendants are unlikely to suffer any monetary damages as a result of the issuance of the injunction. Plaintiffs are excused from the requirement to post a bond or undertaking as a condition for the issuance of the preliminary injunction.

IT IS SO ORDERED.