5 F.3d 383
 23 Envtl. L. Rep. 21,542
 The WILDERNESS SOCIETY; the Oregon Natural Desert
Association, Inc.; Portland Audubon Society;
Oregon Wildlife Federation, Plaintiffs-Appellants,
v.
Bruce BABBITT,* in his official capacity as
Secretary of the Interior; Barry Reiswig, in his official
capacity as Refuge Manager of the Sheldon-Hart Mountain
Refuge Complex; U.S. Fish & Wildlife, Defendants-Appellees,
and
Kiely Bros., Rock Creek Ranch, Inc.; Catherine McKee;
O'Keefe Ranch, Defendants-Intervenors.
 No. 92-36763.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 13, 1993.
Decided Sept. 17, 1993.
 
 Victor M. Sher, Adam J. Berger, Sierra Club Legal Defense Fund, Seattle, WA, for plaintiffs-appellants.
 Andrea N. Ward, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before: GOODWIN, FARRIS, and THOMPSON, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Appellants (collectively "the Wilderness Society") appeal the denial of their application for attorneys' fees pursuant to the Equal Access to Justice Act ("the EAJA"). 28 U.S.C. Sec. 2412(d)(1)(A). The Wilderness Society maintains that the district court abused its discretion in finding: (1) that the Wilderness Society was not a "prevailing party" within the meaning of the EAJA, and (2) that the Service's position was substantially justified. We reverse.
 
 Background
 
 2
 The present action for attorneys' fees stems from a citizen's enforcement suit against appellees (collectively "the Service"). The Wilderness Society claimed that the Service violated the National Environmental Policy Act ("NEPA") by failing to examine the effects of cattle grazing on the Hart Mountain Refuge ("the Refuge") and to disclose such findings in an Environmental Impact Statement ("EIS"). Furthermore, the Service allegedly violated the National Wildlife Refuge System Administration Act ("the Refuge Act"), Executive Order 7523, the Migratory Bird Conservation Act, the Wilderness Act, the Administrative Procedure Act, and Fish & Wildlife Service guidelines by failing to prepare compatibility determinations for grazing on the Refuge and by allowing grazing that was incompatible with the Refuge's purposes.
 
 
 3
 On August 22, 1991, the magistrate in charge of this case[1] recommended dismissal of the Wilderness Society's suit. The magistrate found that, because the Service was in the process of formulating a management plan for the Refuge and had not issued any grazing permits for the 1991 season, the case was not ripe for review. The district court did not enter judgment on the merits because the parties entered into a Stipulation of Dismissal Without Prejudice. The Service formally agreed to prepare an EIS and a compatibility determination, and to refrain from issuing any grazing permits until thirty days after the adoption of a management plan.
 
 
 4
 The stipulation also provided that the Wilderness Society "may file their bill of costs and application for award of attorney fees under 28 U.S.C. Sec. 2412." The district judge denied the Wilderness Society's application seeking $51,691 in attorneys' fees. We review this denial as an abuse of discretion. Thomas v. Peterson, 841 F.2d 332, 334 (9th Cir.1988).
 
 Discussion
 
 5
 The EAJA provides that a court shall award attorneys' fees to a "prevailing party" in a civil action brought against the United States "unless the court finds that the position of the United States was substantially justified or that special circumstances make the award unjust." 28 U.S.C. Sec. 2412(d)(1)(A).I. Prevailing Party
 
 
 6
 Although the Wilderness Society and the Service reached an out-of-court settlement, "[a] party need not obtain formal relief on the merits to be deemed a prevailing party." Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 497 (9th Cir.1987). The Wilderness Society may be deemed a prevailing party if it can demonstrate "a clear, causal relationship between the litigation brought and the practical outcome realized." McQuiston v. Marsh, 707 F.2d 1082, 1085 (9th Cir.1983) (emphasis in original) (citation omitted). We must inquire whether the Wilderness Society's lawsuit was a "material factor" or played a "catalytic role" in bringing about the desired outcome. Kunzman, 817 F.2d at 497. We must then determine whether "the benefit achieved was required by law and was not a gratuitous act of the defendant." Greater Los Angeles Council on Deafness v. Community Television, 813 F.2d 217, 220 (9th Cir.1987).
 
 A. Material or Catalytic Factor
 
 7
 The Wilderness Society argues that the district court clearly erred in finding that the lawsuit was not a material or catalytic factor in prompting the Service to conduct an EIS and a compatibility study and to prohibit grazing on the Refuge pending their completion. It maintains that the catalytic force of the lawsuit is demonstrated by two factors: (1) the chronology of the case, and (2) the extraordinary circumstances surrounding the Service's decisions to undertake the actions urged by the Wilderness Society.
 
 1. Chronology of the Case
 
 8
 "[C]hronological events are important, although not a definitive factor, in determining whether or not a defendant can be reasonably inferred to have guided his actions in response to a plaintiff's lawsuit." Braafladt v. Board of Governors of the Oregon State Bar Ass'n, 778 F.2d 1442, 1444 (9th Cir.1985).
 
 
 9
 The Wilderness Society filed its action on February 7, 1991. At this time, the Service allowed grazing on the Refuge but was considering "temporary" reductions in grazing levels because of drought conditions. On February 6, the Service had urged the grazing permittees to find alternate grazing sources because of the drought conditions. The Service had previously notified them that "[c]ontinued grazing during the remainder of this very dry period can occur only after the needs of [fish and wildlife] resources are met." In the spring, the permittees elected to forego their permits for the 1991 season.
 
 
 10
 In addition, the Service was in the process of preparing a general management plan initiated in February 1989. Two earlier recommendations to prepare a plan, in 1984 and in 1988, had not resulted in the formulation of any plan. Nonetheless, the Service had taken some steps toward realizing the goal of the 1989 recommendation. The Service had commenced public "scoping" meetings in January 1991 which were attended by a total of three hundred people. The Service had also hired two new staff members, albeit seasonal biotechnicians with only "limited experience or expertise in the setup of studies and the analysis of data."
 
 
 11
 In August 1991, seven months after the Wilderness Society filed its lawsuit, the Service decided to prepare an EIS analyzing grazing on the range. The Service hired three full-time biologists for the Refuge staff, upgraded three other scientific positions, and added $200,000 to the Refuge's budget--a 33% increase in funds.
 
 
 12
 The Service also decided to prohibit grazing on the Refuge in 1992. Prior to August, the Service had maintained that "requests for grazing will be reviewed on a case-by-case basis until such time as we have completed refuge management plans and associated NEPA documentation."
 
 
 13
 The Wilderness Society maintains that this sequence of events demonstrates that the Service made little headway in addressing the environmental needs of the Refuge prior to the initiation of the lawsuit. The lawsuit, according to the Wilderness Society, was the catalyst causing the Service to cease grazing on the Refuge and to agree to prepare an EIS and a written compatibility determination.
 
 
 14
 The Service contends, to the contrary, that its decisions flowed logically from an ongoing planning process commenced prior to the lawsuit. According to the Service, the decision to complete an EIS was the result of the feedback received during the January 1991 public "scoping" process and from written comments from Refuge staff, and the decision to ban grazing during the 1992 season was designed to allow the Refuge to recover from the drought.
 
 
 15
 The district court was presented with the task of choosing between two interpretations of the same sequence of events. The court's decision to credit the Service's explanation is not implausible and, based upon this factor alone, the court's decision would not be considered an abuse of discretion.
 
 2. Extraordinary Circumstances
 
 16
 Second, the Wilderness Society maintains that the decisions to complete an EIS and to ban grazing were normally within the province of the Refuge Manager, but that, in this case, the decisions were made at a much higher level of management. The record indicates that these decisions were made by the Refuge Supervisor in consultation with his own supervisor and the Regional Director. Furthermore, these upper-level managers did not consult at all with the Refuge Manager prior to banning grazing on the Refuge in 1992. The Wilderness Society contends that this suggests that the decisions were not motivated by drought concerns; rather, they were part of a deliberate attempt by high-level Service officials to avoid the precedential impact of the underlying lawsuit.
 
 
 17
 The Wilderness Society's position is supported by the testimony of Barry Reiswig, the Refuge Manager. Reiswig testified several times at deposition that the decisions to prepare an EIS and to prohibit interim grazing were part of the settlement of the lawsuit. Reiswig testified: "It's my understanding that [the decision to prohibit grazing in 1992] was part of the court settlement between the Sierra Club and the service." He later testified that the decision whether to allow or prohibit grazing in 1992 had been "precluded by the court settlement."
 
 
 18
 Reiswig had previously been interviewed by a local newspaper and made similar comments regarding the effect of the lawsuit:
 
 
 19
 "Since cattle are not on the refuge, the lawsuit (by the Sierra Club) is not appropriate. If cattle were put on the refuge before the (Environmental Impact Statement), before a compatibility study, the lawsuit would be in effect," Reiswig said.
 
 
 20
 Permittees on the mountain voluntarily kept cattle off the refuge this year, due to drought conditions, and to allow U.S. Fish and Wildlife to forestall a suit by intrest [sic] groups seeking to permanently ban grazing there.
 
 
 21
 "We're pleased with the suit in that, one, it doesn't set a precedent to eliminate grazing nationwide ...," he said.
 
 
 22
 The district court disregarded Reiswig's statements on the ground that Reiswig's "understanding" was based on comments from the Refuge Supervisor, Sanford Wilbur. At his deposition, Wilbur testified as follows:
 
 
 23
 A: ... the reasons for prohibiting [grazing] until after the planning process was complete was a combination of the drought situation, the fact that we had no permittees active on the refuge at that time who had not made other accommodations for at least the next season, and--and because of the controversy about the grazing overall. It was easier just to keep them off for a time. So probably sort of a three-pronged reason for doing that.
 
 
 24
 Q: And did you consider this lawsuit part of that controversy?
 
 
 25
 A: Certainly the lawsuit promoted the controversy.
 
 
 26
 The district court found that "in context, Wilbur's statements cannot reasonably be construed as acknowledging that the lawsuit was a material factor or played a catalytic role in defendant's decisions."
 
 
 27
 An examination of the record, however, reveals no "context" that alters the plain meaning of Wilbur's statements. Wilbur's testimony does not contradict Reiswig's testimony. To the contrary, it supports Reiswig's testimony that the lawsuit played a material role in the decision to ban grazing on the Refuge. We are therefore "left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court clearly erred in finding that the Wilderness Society lawsuit was not a material or catalytic factor in the Service's decision.
 
 B. Not a Gratuitous Act
 
 28
 We therefore turn to the second prong of the "prevailing party" test:
 
 
 29
 If it has been judicially determined that the defendants' conduct, however beneficial it may be to plaintiff's interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense. For prevailing party purposes, a claim has a basis in law as long as it is not frivolous, unreasonable or groundless.
 
 
 30
 Sablan v. Department of Finance, 856 F.2d 1317, 1327 (9th Cir.1988) (quotations omitted).
 
 
 31
 We find that the Wilderness Society has met this burden. The Refuge Act permits the use of a national wildlife refuge only upon a determination "that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. Sec. 668dd(d)(1)(A). Similarly, NEPA requires that "[a]n EIS must be prepared for action that may significantly affect the quality of the human environment." Foundation for N. Am. Wild Sheep v. United States Dep't of Agric., 681 F.2d 1172, 1177 n. 24 (9th Cir.1982) (emphasis in original). The Wilderness Society's lawsuit cannot be considered "frivolous, unreasonable or groundless." Sablan, 856 F.2d at 1327.
 
 
 32
 Having found that the Wilderness Society lawsuit was a material factor in the Service's decisions and that the underlying claim for relief finds some basis in the law, we conclude that the district court abused its discretion in determining that the Wilderness Society was not a prevailing party within the meaning of the EAJA.
 
 II. Substantially Justified
 
 33
 As an alternative ground for its denial of attorneys' fees, the district court held: "Based on the [magistrate's] findings and recommendation recommending dismissal of plaintiffs' action on ripeness grounds, I conclude that the government's position in moving to dismiss on procedural grounds was substantially justified." The court was correct in finding that the Service's procedural litigation defense was substantially justified. The court erred, however, in ending its analysis at this point.
 
 
 34
 Under the EAJA, the "position of the United States" includes both the government's litigating position and "the action or failure to act by the agency upon which the civil action is based." Abela v. Gustafson, 888 F.2d 1258, 1264 (9th Cir.1989). In other words, to determine whether the position of the Service was substantially justified, we must consider not only the "validity of the [government's] action in court" but also the reasonableness of "the underlying government action at issue." Bay Area Peace Navy v. United States, 914 F.2d 1224, 1230 (9th Cir.1990) (quotations omitted).
 
 
 35
 The Service argues that its obligations under the Refuge Act were ambiguous and that it was substantially justified in allowing grazing on the Refuge. See id. at 1231 (holding that absence of adverse precedent is one of several factors to be considered). "Where the Government can show that its case had a reasonable basis both in law and fact, no award will be made." League of Women Voters v. FCC, 798 F.2d 1255, 1257 (9th Cir.1986). We find, however, that the Service's underlying actions in this case, including its failure to halt grazing on the Refuge prior to 1991, was not "justified to a degree that could satisfy a reasonable person." Bay Area Peace Navy, 914 F.2d at 1230 (quotations omitted).
 
 
 36
 The Refuge Act provides that the Secretary of the Interior may "permit the use of any area within the [National Wildlife Refuge] System ... whenever he determines that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. Sec. 668dd(d)(1)(A). In the present case, the Service renewed annual grazing permits without regard to the incompatibility of grazing to the Refuge's purposes. As early as December 1989, the Service was aware that its grazing practices were damaging the Refuge. The Refuge Manager warned that "there is no question that current grazing practices causing this damage are negatively impacting fish and wildlife habitats and are (1.) in violation of the refuge's executive orders and (2.) currently not compatible with the uses for which the refuges were established."
 
 
 37
 The Refuge Manager's report did not foreclose the possibility that the Service could formulate a grazing plan that would be compatible with purposes of the Refuge. Based upon this report, however, the Service had a duty to investigate the compatibility of grazing with the Refuge's purposes prior to permitting grazing on the Refuge. Nonetheless, the Service continued its same practices, issuing grazing permits for 1990 without any compatibility determination. It made little headway in formulating a new management plan prior to the initiation of the Wilderness Society lawsuit in 1991. In light of the Refuge Manager's report, we cannot find that the Service's actions were substantially justified.[2]
 
 
 38
 In conclusion, we hold that the Wilderness Society was a prevailing party within the meaning of the EAJA and that the Service's position was not substantially justified.[3]
 
 
 39
 REVERSED and REMANDED for further proceedings in accord with this judgment.
 
 
 40
 FARRIS, Circuit Judge, dissenting.
 
 
 41
 I concur in Part I of the majority's opinion. I also agree with its finding in Part II that the Service's litigation position was substantially justified. I disagree, however, with the majority's conclusion that the trial court erred in holding that the Service was substantially justified in taking the actions that gave rise to the underlying suit.
 
 
 42
 The majority asserts that the Service renewed annual grazing permits "without regard" to the incompatibility of grazing with the Refuge's purposes. The Service did not ignore the problems posed by grazing. It began to develop a comprehensive management plan for the Refuge in 1989. It began collecting biological data and holding public meetings on the effects of grazing before the Wilderness Society filed suit. The majority does not argue that these facts, determined by the district court, are clearly erroneous. Rather, the majority holds that once the Refuge Manager, Barry Reiswig, expressed his opinion that the current grazing practices were incompatible with the Refuge's purposes, the Service had only one reasonable choice: immediately stop issuing and renewing grazing permits and conduct a compatibility analysis. Neither the Refuge Act,[1] nor our precedents command that conclusion. The trial court did not err. I dissent.
 
 
 43
 The Service "need not be justified to a high degree but rather justified in substance or in main--that is, justified to a degree that could satisfy a reasonable person." Bay Area Peace Navy v. United States, 914 F.2d 1224, 1230 (9th Cir.1990). The majority states that in light of Reiswig's report, the Service's actions were not substantially justified. The Reiswig memorandum can not bear the weight that the majority places upon it. Reiswig did not state that any grazing would be incompatible with the purpose of the Refuge. He merely criticized "current practices". Moreover, in his deposition, Reiswig testified that he and his supervisors determined that grazing could be compatible with the purposes of the Refuge if properly managed. He testified that he and his supervisors met to discuss the application of new management techniques. Thus, the Reiswig memorandum, especially taken together with his deposition testimony, does not support the majority's conclusion that the Service ignored a warning that one of its practices was illegal. The Service recognized a problem and began taking steps to correct it. The district court found that the Service's actions were substantially justified. The majority improperly substitutes its judgment for that of the district court. See Thomas v. Peterson, 841 F.2d 332, 334 (9th Cir.1988).[2]
 
 
 44
 The Refuge Act does not specify that the Service has a duty to make a compatibility determination to permit the continuation of a preexisting use of the Refuge. See 16 U.S.C. Sec. 668dd(d)(1)(A). The majority holds that the Act required the Service to complete a compatibility analysis before permitting any more grazing, a practice that had been permitted on the Refuge since 1936. I find a complete absence of authority to support the requirement. Without plain language or precedent to alert the Service to its "duty" under the Act, the Service was not unreasonable for continuing an age old practice while it formulated alternatives. Even if the majority's interpretation of the Act--announced today for the first time--is correct, I would still find that the Service was substantially justified in its actions. See Bay Area Peace Navy, 914 F.2d at 1231 (holding that the absence of adverse precedent supports finding that the government was substantially justified).
 
 
 45
 For the same reasons, I would find that the Service was substantially justified in not preparing an Environmental Impact Statement before renewing any grazing permits.[3] Basing its decision on the Service's purported failure to comply with the Refuge Act, the majority does not address the Service's responsibility under NEPA. If it had, it would have needed to explain our decisions in which we have held that the government need not prepare an EIS for ongoing programs unless they "rise to the level of major federal actions...." Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 235 n. 3 (9th Cir.1990) (periodic adjustments of water flow are part of ongoing operation of dam); see also Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir.1980), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981) (holding that an EIS is not required when "the proposed federal action will effect no change in the status quo."). The Service was justified in relying on our precedents. The majority fails to explain why our rationale for not requiring an EIS for ongoing operations under NEPA does not also apply to the compatibility analysis required by the Refuge Act.[4]
 
 
 46
 On the basis of a single memorandum, without benefit of trial, the majority confidently holds that the Service has breached its duty. I am troubled by the perverse incentives created by this holding and the adverse consequences it will have beyond this case. The majority tells all government agencies that if they discover a problem with one of their programs, they should never discuss it openly and frankly. If one member of an agency expresses an opinion, and the government does not immediately adopt his position, a court may later find that the agency illegally "disregarded" his advice. That is not and should not be the law.
 
 
 47
 The district court found that the Service's actions were substantially justified. I would affirm the district court's sound judgment.
 
 
 
 *
 Bruce Babbitt is substituted for his predecessor, Manuel Lujan, as Secretary of the Interior. Fed.R.App.P. 43(c)(1)
 
 
 [1]
 Michael Hogan became a United States District Judge for the District of Oregon on September 16, 1991. Prior to that time, he was a United States Magistrate with responsibility over this case
 
 
 [2]
 The dissent argues that the Service's failure to comply with the Refuge Act was substantially justified on the ground that the "ongoing activity" exception to NEPA requirements might also apply to Refuge Act requirements. We disagree. Neither the Service nor the dissent cites any caselaw in support of the proposition that a particular exception to NEPA is generally applicable to all environmental statutes
 In addition, we stress that our holding is limited to the facts of the present case: the Service renewed the grazing permits in 1990 despite its knowledge that it was permitting a use that was incompatible with the purposes of the Refuge. We need not address the separate issue whether a compatibility determination must be completed for all ongoing activities.
 
 
 [3]
 Because we find that the Service was not substantially justified in its failure to comply with the Refuge Act, we need not also consider its failure to comply with NEPA
 
 
 [1]
 16 U.S.C. Sec. 668dd (1988)
 
 
 [2]
 The district court did not explicitly find that the Service's underlying actions were substantially justified. However, its finding that the Service had "identified a problem with grazing on the refuge and was responding appropriately" suggests that it found both the Service's actions and its litigation strategy substantially justified
 
 
 [3]
 The National Environmental Policy Act, 42 U.S.C. Secs. 4321-4361 (1988), requires government agencies to prepare an EIS before undertaking major projects affecting the environment. Id. at Sec. 4432(C)
 
 
 [4]
 The court's holding, with which I agree, that the Wilderness Society is a "prevailing party" does not imply that the Service violated the Refuge Act or NEPA. It merely means that the Wilderness Society's suit was not "frivolous, unreasonable or groundless." Sablan v. Department of Finance, 856 F.2d 1317, 1327 (9th Cir.1988) (quotations omitted)