182 F.Supp.2d 944 (2001)
SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, CALIFORNIA NATIVE PLANT SOCIETY; Tri-County Conservation League, Plaintiffs,
v.
Colonel John P. CARROLL, in his official capacity as District Engineer of the Army Chief of Army Corps of Engineers; and United States Army Crops of Engineers, and Does 1 through 10, Inclusive, Defendants.
Western Municipal Water District of Riverside County; and San Bernardino Valley Municipal Water District, Defendants in Intervention.
No. 99-CV-2821.
United States District Court, C.D. California.
August 31, 2001.
*945 Gregory J. Newmark, Shawn Khorrami Law Offices, Van Nuys, CA, Geoff Hickcox, Kenna & Hickcox, Durango, CA, Babak Naficy, San Luis Obispo, CA, for Plaintiffs.
Leon W. Weidman, Asst. U.S. Atty., Civil Division, Los Angeles, CA, Johnn K. Rubiner, Bird Marella Boxer & Wolpert, Los Angeles, CA, Lisa Lynne Russell, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, Gregory K. Wilkinson, Jennifer T. Buckman, Best Best & Krieger, Riverside, CA, for Defendants.
ORDER GRANTING PLAINTIFFS' MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. PROC. 59(E) AND GRANTING PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES
MORENO, District Judge.
Presently before the Court is Plaintiffs' Motion to Alter Judgment Pursuant to Fed. R. Civ. Proc. 59(e), and grant Plaintiff's previous Motion for Attorney's Fees. Having considered the parties' papers briefing the applicability of the Supreme Court's decision in Buckhannon Board and Care Home, Inc. v. West Virginia Department, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), the Court grants Plaintiffs' motion. Therefore, the Court also grants Plaintiffs' request for attorney's fees.

I. Overview and Procedural History

In the 1980s, the Army Corps of Engineers (the "Corps") proposed to construct the Seven Oaks Dam as part of the Santa Ana Mainstream River Project (the "Project"). One of the main purposes of the Project was to provide flood control along the upper and lower portions of the Santa Ana River.
Pursuant to the Endangered Species Act ("ESA"), the Corps consulted with the United States Fish and Wildlife Service ("FWS"). The FWS collected data from 1988 through 1989. On June 22, 1989, the FWS issued a biological opinion in which it concluded that the construction of the dam would not jeopardize the existence of the Santa Ana River woolly star. The biological opinion, however, did not examine the Project's impact on the slender-horned spineflower, another endangered plant species. The FWS apparently concurred with the Corps' assessment that the Project would not adversely affect the slender-horned spineflower. The biological opinion *946 also failed to address the Project's impact on the San Bernardino kangaroo rat ("SBKR") given that, at the time, it was not listed under the ESA as an endangered species.
On March 18, 1999, Plaintiffs filed an action for declaratory judgment and injunctive relief against the Corps. On June 14, 1999, this Court granted Western Municipal Water District of Riverside and San Bernardino Valley Municipal Water District's ("Interveners") Motion to Intervene. On June 12, 2000, the Court stayed proceedings until August 2000. On November 22, 2000 the Court entered the parties' stipulation to a voluntary dismissal.
Plaintiffs (as well as Interveners) thereafter moved this Court for an award of attorney's fees and costs. At a hearing on April 30, 2001, the Court informed the parties that its tentative ruling was to grant Plaintiffs' motion for attorney's fees and litigation expenses, and to deny Defendant Intervener's request. After hearing the arguments, the Court took the motions under submission. Before this Court issued its final decision, the Supreme Court issued a ruling in the case of Buckhannon Board and Care Home, Inc. v. West Virginia Department, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Based on the Supreme Court's decision, this Court initially denied Plaintiffs' fee motion on June 5, 2001. The Court also denied Defendant Intervener's motion on different grounds. In order to allow Plaintiffs the opportunity to brief the applicability of Buckhannon, however, this Court granted Plaintiffs leave to file a Motion to Alter Judgment pursuant to Fed. R. Civ. Proc. 59(e).

II. Analysis

A. Applicability of Buckhannon.

Prior to Buckhannon, the Ninth Circuit (and all other Federal Circuits except the Fourth) had interpreted the "prevailing party" language of the attorney fee provisions in a number of civil rights statutes to allow plaintiffs to recover fees under the "catalyst theory." Kilgour v. City of Pasadena, 53 F.3d 1007, 1010 (9th Cir.1995). Under this theory of attorney fee recovery, a plaintiff can recover attorney's fees through means other than a judgment in its favor if: 1) its lawsuit was causally linked  i.e., the lawsuit was a catalytic factor  to securing the benefit obtained and 2) the benefit obtained was required by law as opposed to a gratuitous act by the defendant. Kasza v. Browner, 133 F.3d 1159, 1175 (9th Cir.1998).
However, in Buckhannon, the Supreme Court overruled the precedent of a majority of circuits and held that the plain meaning of the "prevailing party" language in the attorney's fee provisions of the Fair Housing Amendments Act of 1988 ("FHAA") and the Americans with Disabilities Act of 1990 ("ADA") does not support application of the "catalyst theory."[1] The Court concluded that the term "prevailing party" as used in the attorney's fee provisions of various civil rights statutes, requires a "material alteration of the legal relationship of the parties" and that the "catalyst theory" fails to satisfy this requirement because "[i]t allows an award where there is no judicially sanctioned change in the legal relationship of the parties." Id. at 1840 (internal quotations omitted).
Therefore, now at issue in this case is whether the Supreme Court's ruling in *947 Buckhannon extends to the attorney's fee provision in the ESA, which authorizes courts to "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4) (emphasis added).
Plaintiffs contend that the Buckhannon decision is inapplicable to the fee provisions of the ESA, because the basis of the Supreme Court's decision in that case was the interpretation of the plain meaning of the "prevailing party" language in the fee shifting provisions of those (and other) civil rights statutes. Plaintiffs suggest that the obvious difference in the language of the ESA fee provisions, as well as the stronger support for the "catalyst theory" that can be found in similarly interpreted environmental statutes' legislative history distinguish the Supreme Court's decision.
This Court agrees that in rejecting the "catalyst theory" in the context of the FHAA and ADA, the Supreme Court expressly relied on the plain meaning of the language in those statutes:
Congress employed the term `prevailing party,' a legal term of art. Black's Law Dictionary 1145 (7th ed.1999) defines `prevailing party' as `[a] party in whose favor a judgment is rendered [].' This view that a `prevailing party' is one who has been awarded some relief by the court can [also] be distilled from our prior cases.
Buckhannon, 121 S.Ct. at 1839.
Because the "whenever...appropriate" language of the ESA is distinguishable on its face from the "prevailing party" language of the civil rights statutes, this Court is reluctant to extend the Buckhannon holding to the fee provisions of the ESA.
Furthermore, in reaching its ultimate conclusion, the Court squared its interpretation of the plain meaning of the language with its prior civil rights attorney's fees holdings, and also reasoned that the legislative history was "clearly insufficient to alter the accepted meaning of the statutory term." Id. at 1842. In contrast, in concluding that the "whenever...appropriate" language used in the fee provisions of various environmental statutes did not allow for an award of attorney's fees when the plaintiffs failed to obtain any of the relief they requested, the Supreme Court recognized that in the legislative history of the Clean Air Act, Congress stated:
[t]he Courts should recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party. This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions.
Ruckelshaus v. Sierra Club, 463 U.S. 680, 686, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (quoting S.Rep. No.91-1196, 91st Cong., 2d Sess. 38 (1970) (emphasis added).
The Court noted that if Congress desired to extend fees to parties without any success on the merits, "it plainly would have said so, as is demonstrated by Congress' careful statement that a less sweeping innovation was adopted." Id. Therefore, the Court implicitly recognized Congressional intent to adopt the "catalyst theory" of attorney's fee awards in statutes, such as the CAA, that contain the "whenever ...appropriate" standard.[2]
*948 Defendants counter the Court's interpretation of the legislative history of this identical provision of the CAA by arguing that the Supreme Court's decision in Ruckelshaus, and the Ninth Circuit's application of this decision in Marbled Murrelet v. Babbitt, 182 F.3d 1091 (9th Cir. 1999), actually support the extension of the holding in Buckhannon to the ESA. Defendants note that the Supreme Court concluded that "[s]ection 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties  parties achieving some success." Ruckelshaus, 463 U.S. at 688, 103 S.Ct. 3274 (emphasis in original). Similarly, in Marbled Murrelet, in holding that an environmental group's claim was not frivolous for purposes of a fee award, the Ninth Circuit noted that the Supreme Court in Ruckelshaus "has read a prevailing party requirement into the ESA." Marbled Murrelet, 182 F.3d at 1095. While this Court is cognizant of the analogous language used by these courts in explaining their decisions, neither of the actual holdings in these two cases, nor any other Ninth Circuit case, address the question of Congressional intent with regards to the "catalyst theory" and the "whenever ...appropriate" language of the ESA.
Furthermore, given the Supreme Court's citation to the legislative history of the CAA that supported the "catalyst theory" of attorney fee awards in Ruckelshaus, and the prevailing Ninth Circuit precedent at the time that Marbled Murrelet was decided, we cannot conclude that the Court's use of the term "partially prevailing party" was aimed at precluding an attorney's fee award based on the "catalyst theory" in the ESA.
In reaching our conclusion, we note that although the Buckhannon Court extended its holding to attorney's fee provisions in other civil rights statutes, it did not address the interpretation of the "whenever ...appropriate" language of the ESA or other environmental statutes. It is true, as defendant points out, that in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Court has suggested that the purpose of environmental and civil rights statutes were sufficiently similar to warrant the same interpretation of language used in their attorney's fee provisions. However, unlike this case, in that case the Court was interpreting language ("action") that was used in both statutes. Id. at 560, 106 S.Ct. 3088. Given the Court's increased reliance on the plain meaning of the specific language used by Congress in its statutes, and the lack of any mention of the ESA or other environmental statutes in Buckhannon, we are disinclined to extend the Court's interpretation to language that is dissimilar on its face.
For these reasons we hold that in the absence of any Supreme Court or Ninth Circuit precedent overruling the "catalyst theory" in the context of the ESA or other similar environmental statutes, it is appropriate for this Court to exercise its discretion under § 1540(g)(4) and determine whether an attorney's fee award is appropriate in this case.[3]

*949 B. Application of `Catalyst Theory'

The thrust of Plaintiff's First Amended Complaint is a request for "an order compelling the Corps to consult with FWS regarding the effects of the Seven Oaks Dam." First Am. Compl. ¶ 4. In particular, Plaintiff was concerned with the Project's effects on the SBKR, the slenderhorned spineflower, and the wooly star. First Am. Compl. ¶¶ 49-54. The Plaintiff alleged violations of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations. In particular, Plaintiffs alleged that the Corps failed to consult or reinitiate consultation as per section 7(a)(2). First Am. Compl. ¶¶ 49-54.
Section 7(a)(2) provides that:
Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...
A federal agency is obliged to consult with the FWS with regard to prospective agency action when the agency "has reason to believe that an endangered species or a threatened species may be present in the area affected by [its] project and that...such action will likely affect such species." 16 U.S.C. § 1536(a)(3).
There are two types of consultation: formal and informal. Formal consultation is a process that transpires between the FWS and the Federal agency upon the Federal agency's written request for consultation under section 7(a)(2). 50 C.F.R. § 402.02. Informal consultation, on the other hand, is "an optional process that includes all discussions, correspondence, etc." between the FWS and the Federal agency prior to formal consultation. Id.
Where a Federal agency is undertaking "major construction activity,"[4] it is obliged to prepare a biological assessment ("BA"). 50 C.F.R. § 402.12(b). A BA evaluates the potential effects of the agency action upon listed and proposed endangered species; the BA is used in determining whether formal consultation is necessary. 50 C.F.R. § 402.12(a).
If, during informal consultation's course, the FWS concurs with the Federal agency's assessment that the agency action is unlikely to adversely affect listed species, the consultation process is terminated. 50 C.F.R. § 402.13(b). If, however, formal consultation becomes necessary, the FWS is obliged to produce a biological opinion ("BO"), 15 U.S.C. § 1563(b)(3). The BO advise the Federal agency whether its proposed agency action is likely to jeopardize any listed species and, if so, whether reasonable alternatives exist. Id.

1. Success on the Merits

On August 11, 2000, the Corps issued a BA in which it included the SBKR, the slenderhorned spineflower, and the wooly star in an effort to reinitiate consultation with the FWS. Geoff Hickox decl. ¶ 20. In addition, the BA used the date each species was listed as endangered in defining the "environmental baseline"[5] for each *950 species. Id. The Corps initially planned on using the SBKR's listing date as the environmental baseline for all three species. Hickox decl. ¶ 14. Evidence indicates that one of the Plaintiff's primary demands during the litigation was that the Corps determine the environmental baseline for each species by referring to its own listing date. Id. The Corps' August 2000 BA was largely consistent with Plaintiffs' demands.

2. Required by Law

The ESA is relatively clear that it was the Corps' legal obligation to insure, in consultation with the FWS, that the Seven Oaks Dam not jeopardize any endangered species. 16 U.S.C. § 1536(a)(2). To the extent that a formal consultation occurred prior to construction's onset, the ESA's implementing regulations mandate that Federal agencies reinitiate consultation where "new information reveals effects of the action that may affect listed species or critical habitat in a manner...not previously considered." 50 C.F.R. § 402.16. In addition, Federal agencies are obliged to reinitiate consultation:
If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
If a new species is listed or critical habitat designated that may be affected by the identified action.
Id. The ESA's statutory and regulatory scheme strongly indicate that the Corps' August 2000 BA was required by law.

3. Causality

Plaintiffs convincingly argue that their litigation was a catalyst for the Corps' August 2000 BA. "Whether a litigant has shown a sufficient causal relationship between the lawsuit and the practical outcome realized is a pragmatic factual inquiry for the district court." Sablan v. Dept. of Fin. of Northern Mariana Islands, 856 F.2d 1317, 1324-25 (9th Cir. 1988). Chronological events are important in determining whether a lawsuit was a material or catalytic factor in prompting a Federal agency to take certain actions. Wilderness Society v. Babbitt, 5 F.3d 383, 386 (9th Cir.1993).
The Corps argues that the August 2000 BA was entirely the product of its own initiative and informal consultation with the FWS. The Corp notes that Plaintiffs filed three notices to sue in 1998 and brought suit in 1999. The Corps, however, contends that Pls.' lawsuit had no impact upon its decision to draft the August 2000 BA. A summary of the Corps' factual account follows.
The Corps' account begins in 1988 when it prepared a BA that considered five endangered species that would be potentially affected by the Project. The 1988 BA considered the wooly star. The BO that subsequently issued concluded that the wooly star's existence would not be jeopardized by the Project. In 1996, after the FWS designated the SBKR as a federally recognized species, the Corps anticipated the FWS listing the SBKR as endangered. As such the Corps drafted a BA. The Corps and the FWS, however, informally coordinated a strategy to minimize harm to the SBKR. As such, the FWS produced no BO.
On January 27, 1998 the FWS listed the SBKR as an endangered species. The Corps claims that, thereafter, it initiated *951 surveys to confirm the SBKR's presence in the Project area and ascertain whether continued excavation would adversely affect it. The FWS issued a BO in February 1998 permitting excavation to continue. Thereafter, the Corps began work on a BA whose purpose was to evaluate the dam's indirect and cumulative effects of completing the Project on the SBKR. The Corps completed a draft of the BA in April 1998. It concluded that completing the dam was unlikely to affect the SBKR. The FWS essentially concurred in the Corps' conclusion. As such no BO was produced. The Corps and the FWS, however, agreed that the Corps would continue to gather data on the SBKR and finalize its BA at some indefinite point in the future.
From 1999 through early 2000, the Corps conducted various studies as part of its BA preparation. In so doing, it expanded the scope of analysis for its Section 7 consultation to include the wooly star and the slenderhorned spineflower. By the Corp's account, the August 2000 BA was the product of its independent investigations from 1999 through early 2000.
It bears noting that the Corps relies exclusively upon the declaration of Ruth B. Villalobos, Chief of the Environmental Resources Branch of the Corps. It makes no reference to the Administrative Record. It would be modest to call the Corps' depiction of what transpired between the Plaintiffs filing their complaint and the August 2000 BA's release a gloss. The Corps leaves critical facts out of its chronology.
The Plaintiffs filed their first notice of intent to sue on November 21, 1997. On January 29, 1998, two days after the SBKR was listed as endangered, the Plaintiffs filed their second notice of intent to sue. The Corps responded in a letter dated January 30, 1998. In this letter the Corps announced that it would not reinitiate consultation for the wooly star or the slenderhorned spineflower; it would only do so for the SBKR. Administrative Record ("AR") Ex. 25 at 2110-2115. On June 30, 1998, Plaintiff dispatched another notice of intent to sue for the Corps' failure to reinitiate consultation. The Plaintiff filed its Complaint on March 18, 1999.
On April 1, 1999, the Corps announced to local sponsors of the Seven Oaks Dam project that there would be no reinitiation of consultation for the wooly star or slenderhorned spineflower. AR Ex. 36. at 2454. On October 20, 1999, the Corps responded to the Plaintiffs' settlement inquiries by offering to prepare a BA regarding the SBKR alone. Hickox decl. ¶ 8.
On February 25, 2000, in the course of settlement discussions, the Corps agreed to include the wooly star and slenderhorned spineflower in its BA. Id. at ¶ 12. The Corps, however, indicated that it would use the SBKR's listing date as the environmental baseline for all three species. In addition, the parties disagreed as to a schedule for the Corps completing its BA. Following a series of subsequent interactions, the Plaintiffs, with the Corps' approval, filed a motion to stay proceedings on May 8, 2000. The motion to stay indicated that the parties had agreed to July 28, 2000 for issuance of the Corps' BA. The Corps issued its BA on August 11, 2000. In it the Corps adopts the environmental baselines for the wooly star and slenderhorned spineflower that the Plaintiffs advocated for.
The evidence indicates that the Plaintiffs played an active role in the process that culminated in the Corps' August 2000 BA. As such, the Court finds that the Plaintiffs' lawsuit was a substantial catalytic factor in: 1) securing the Corps commitment to reinitiate consultation for the wooly star and slenderhorned spineflower and 2) the Corps adopting the appropriate environmental *952 baselines for the wooly star and slenderhorned spineflower.

Conclusion
For the reasons stated above, Plaintiffs' motion to alter judgment is granted. Therefore, Plaintiffs' request for attorney's fees in the amount of $44,350.00 and for expenses in the amount of $600,00 is also granted.
IT IS SO ORDERED.
NOTES
[1] The FHAA provides that "the court, in its discretion, may allow the prevailing party...a reasonable attorney's fee and costs." 42 U.S.C. § 3613(2)(c). Similarly, the ADA provides that "the court...in its discretion, may allow the prevailing party...a reasonable attorney's fee, including litigation expenses and costs." 42 U.S.C. § 12205.
[2] The Court noted that interpretation of the "whenever...appropriate" language of § 307 controls construction of the same term in environmental statutes with fee provisions using the same language, such as the Endangered Species Act, 16 U.S.C. § 1540(g)(4), Id. at 682 n. 1, 103 S.Ct. 3274.
[3] While the Ninth Circuit has not addressed the issue of the availability of the "catalyst theory" under the ESA, the Tenth Circuit recently noted (while declining to authoritatively address the issue) that because of the different language used in § 1540(g)(4), "the basis of the Court's conclusion in Buckhannon is not applicable[.]" Center for Biological Diversity et. al. v. Gale A. Norton, 262 F.3d 1077, 1080 n. 2 (10th Cir.2001).
[4] There does not appear to be any contest that the Seven Oaks Dam project was a "major construction activity" as defined in 50 C.F.R. § 402.02.
[5] The environmental baseline is the point from which the agency action's effects are measured:

"Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process....
50 C.F.R. § 402.02.